RICHARD SEGERBLOM, ESQ.
Nevada Bar No. 1010
700 South Third Street
Las Vegas, Nevada 89101
Tel: (702) 388-9600
Fax: (702) 385-2909
Attorney for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| ELENA RODRIGUEZ-MALFAVON, | ) |
| Plaintiff, | ) |
| vs. | )      2:12-cv-1673-APG-PAL |
| CLARK COUNTY SCHOOL DISTRICT, EDWARD GOLDMAN and ANITA WILBUR, | ) |
| Defendants. | ) |

## OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff Elena Rodriguez-Malfavon and opposes the Defendants' Motion for Summary Judgment on the grounds that there are questions of fact surrounding her Retaliation and First Amendment claims which cannot be resolved as a matter of law. This opposition is based on the pleadings and papers on file together with the attached Points and Authorities and Exhibits.

Dated this 30th day of July, 2015.

//Richard Segerblom
RICHARD SEGERBLOM
700 S. Third Street
Las Vegas, NV 89101
Attorney for Plaintiff

**POINTS AND AUTHORITIES**

**I.      Introduction**

This case involves a long-term Clark County School District ("CCSD") administrator who was demoted in 2011 after receiving two unsatisfactory annual evaluations.  The administrator, Plaintiff Rodriguez-Malfavon, is a Cuban-American.  She alleges she was given the negative evaluations in 2010 and 2011 which lead to her demotion in retaliation for her complaining about discrimination and/or in retaliation for blowing the whistle on her principal who was secretly video and audio taping employees, students and parents.

Defendant Goldman is also a long-term CCSD administrator.  Goldman has a history of retaliating against CCSD employees who exercise their First Amendment rights and of ratifying the retaliatory acts of other CCSD administrators.  In <u>Lytle v. Carl</u>, 382 F.3d 978 (9 Cir. 2004), the Ninth Circuit upheld a First Amendment jury verdict against CCSD where Goldman had reviewed all discipline and documents and had collaborated on the conferences and directives that the teacher alleged were retaliatory, concluding that "[t]he jury could reasonably infer from this evidence that **Goldman actively participated** in the discipline of Lytle and ratified the decisions of his subordinates."  <u>Id.</u> at 988 (emphasis added).  This case is yet another example of Goldman engaging in unlawful retaliation.

**II.      Factual Background**

    **A.      Rodriguez-Malfavon's Employment History with CCSD.**

Rodriguez-Malfavon is a computer programer by education and training.  She started with CCSD as a support staff employee in 1990.  She was promoted to an administrative position - Coordinator III - in 2002, serving as the head of

2

1    Substitute Services supervising the hiring and placement of over 3000 substitutes,

2    supervising 16 employees.

3         In December 2005, Rodriguez-Malfavon voluntarily transferred from Human

4    Resources to work on the ERP Project coordinating HR Mini-Master Maintenance,

5    a part of the District's attempt to place all the District's departments under one

6    computer system.  In this job Rodriguez-Malfavon continued to work directly with

7    the Human Resources Department Directors and Staff.  Rodriguez-Malfavon's

8    history with CCSD through the end of 2008 was one of outstanding service as

9    recognized by her positive annual evaluations and promotions.

10

11

12        **B.    Plaintiff's Transfer to the Purchasing Department**

13        When the economy tanked and the District's revenue collapsed, ERP was

14   deemed expendible and the ERP Department was eliminated.  Most ERP

15   employees were transferred back to the department they came from, but continued

16   to work on their ERP tasks.  However, in January 2009, instead of going back to

17   Personnel where she had previously worked, the District transferred Rodriguez-

18   Malfavon to the Purchasing Department.

19        Shortly after arriving at the Purchasing Department Rodriguez-Malfavano

20   was told by Jim McIntosh, her former supervisor at ERP, and Bramby Tollen, the

21   head of Purchasing, that she would continue to work on ERP computer programing

22   issues.  However, shortly after the transfer her duties were changed by her

23   supervisor, Al Ringhofer, and she was put in charge of leading the Support Pack

24   Testing and the SAPGUI testing for the ERP project.  (Rodriguez-Malfavon

25

26

27

28                                            **3**

Declaration, ¶ 3, Exh. 3.)[1]  In June, 2009, Rodriguez-Malfavon's annual evaluation rated her satisfactory and indicated no problems with her performance.  (Exh. 1.)

On September 28, 2009, Rodriguez-Malfavon's supervision was changed from Ringhofer to his boss, Bramby Tollen.  Tollen removed Rodriguez-Malfavon from the ERP Project and placed her in charge of supervising some of the Assistant Buyers and Senior Buyers in the Department.  Rodriguez-Malfavon was told her duties were being changed because she had been doing such a great job.  (¶ 2.)

Shortly after moving to Tollen's supervision, Rodriguez-Malfavon experienced what she considered to be disparate discriminatory treatment by Tollen.  Tollen was treating Rodriguez-Malfavon differently than other employees non-Cuban employees.  Unhappy with her assigned duties and not wanting to be subjected to Tollen's discriminatory treatment, Rodriguez-Malfavon asked her union how she could transfer back to Personnel where her skills and experience lay.  The union advised her that Tollen couldn't affect a transfer.  According to the union, only Tollen's supervisor, Jeff Weiler, could affect a transfer.  On October 13, 2009, the Plaintiff sent Weiler an email asking for a transfer back to Human Resources.  (Exh. 2.)  That email triggered a serious of events which ultimately led to her demotion and this lawsuit.

Rodriguez-Malfavon's email to Weiler did not focus on Tollen's conduct, but merely explained how she felt she was told one thing before she transferred and then another after she arrived in Purchasing.  Rodriguez-Malfavon explained she wanted to go back to working on ERP issues given her background in computer programing.  Rodriguez-Malfavon did not mention that she felt Tollen was discriminating against her and treating her differently because of her national origin because she did not want to cause any problems for Tollen or herself.  She

---

[1] All citations to "¶" refer to Malfavon-Rodriguez's Declaration included with this Opposition Brief

1   merely wanted a transfer.  (¶ 3.)

2       Weiler forwarded the email to Tollen and the rest is history - Tollen took

3   umbrage at the fact that Rodriguez-Malfavon went over her head to request a

4   transfer and accused her of being dishonest "because you went behind my back

5   without letting me know anything was wrong."  (Exh. 3, p. 9.)  Tollen conducted

6   an investigatory interview on October 19 2009.  During that interview, Rodriguez-

7   Malfavon clearly articulated that some of her concerns involved discrimination,

8   and she was planning to bring those discrimination issues to the attention of

9   CCSD's Affirmative Action Officer, Tom Rodriguez.  (¶ 4; Exh. 3 - Summary of

10  10.19.09 interview, pp. 7, 9.)

11      The transcript of that meeting is extremely telling.  Tollen made it clear that

12  she considered it dishonest for an employee to seek help without going to her first.

13  It was clear to Rodriguez-Malfavon that when she referred to going to CCSD

14  Affirmative Action Officer Tom Rodriguez both she and Tollen understood she

15  was complaining about national origin discrimination in violation of anti-

16  discrimination statutes.  Tollen was well aware that Rodriguez-Malfavon was

17  Cuban-American.  Tollen and Rodriguez-Malfavon had discussed the fact that the

18  Plaintiff is Cuban, Tollen had used Rodriguez-Malfavon to translate from Spanish

19  to English when Spanish speaking individuals came to the Purchasing Department,

20  and Tollen had assigned Rodriguez-Malfavon to be the Department's liason to the

21  Latin Chamber of Commerce.  (¶ 4.)

22      According to the November 9, 2009 Summary of Conference, which

23  summarizes the October 19 meeting with Tollen, Rodriguez-Malfavon stated

24  Tollen had "treated [her] unfairly in several areas" and she was "going to talk to

25  Tom Rodriguez about it."  (Exh. 4.)  Clearly everyone knew that Rodriguez-

26  Malfavon was planing to complain to the CCSD Affirmative Action office about

27  Tollen's illegal discriminatory treatment.

28

Most important, the November 9 Summary of Conference "directed" Rodriguez-Malfavon to "follow protocol and afford the chain of command an opportunity to address your concerns before elevating them over your supervising administrator." (Exh. 4.)  In issuing that dictate, Tollen violated a fundamental tenet of anti-discrimination law -- a victim need not complain to the supervisor she is complaining about -- she is absolutely protected from retaliation if she complains directly above that supervisor's head to a higher-level supervisor, to an in-house affirmative action officer or to an outside agency.  In threatening Rodriguez-Malfavon not to take her issues "over your supervising administrator" Tollen was clearly trying to stop Rodriguez-Malfavon from filing a discrimination complaint.

To emphasize her point that she was unhappy that Rodriguez-Malfavon had gone over her head Tollen notified Rodriguez-Malfavon on November 13 that she was being moved from her private office to a cubicle.  (¶ 6; Exh. 5.)  One week later, Rodriguez-Malfavon emailed Tom Rodriguez notifying him that she wished to file discrimination and harassment charges against Tollen.  The next day, November 23, 2009, Rodriguez-Malfavon emailed Tollen's supervisor Weiler notifying him that since her request for a transfer back in October "the work relationship between Mrs. Tollen and I has deteriorated quite rapidly."  (Exh. 6, 7.) In that email Rodriguez-Malfavano explained she was filing discrimination and harassment charges against Tollen with Tom Rodriguez and the EEOC.

Two days later, Rodriguez-Malfavon was called into an investigatory interview with Tollen and questioned about her November 23 email to Weiler. That interview started out with a recitation from the November 9 Summary of Conference "you were directed to follow protocol and afford the chain of command an opportunity to address your concerns before elevating them over your supervising administrator."  (Exh. 8.)  Tollen then stated "you understand that disregarding a directive from your supervisor is insubordination?"  Id.  Clearly

6

1    Tollen was accusing Rodriguez-Malfavon of insubordination for sending the email

2    to Weiler alleging discrimination and harassment.  This accusation constituted

3    blatant retaliation in violation of Title VII, as Rodriguez-Malfavon has an absolute

4    right to complain about discrimination by Tollen to anyone in Tollen's chain of

5    command or any outside agency which deals with discrimination issues.

6            Tollen's illegal retaliation culiminated in the issuance of an oral warning on

7    December 3, 2009.  (Exh. 9.)  In that disciplinary document Tollen specifically

8    referenced Rodriguez-Malfavon's protected email to Weiler as a basis for the

9    discipline because in sending the email the Plaintiff had "gone over her

10   supervisor's head."

11           In referencing Rodriguez-Malfavon's email as a basis for the oral warning,

12   Tollen irreparably tainted any subsequent discipline and/or negative evaluation

13   which referenced that oral warning, making that discipline a byproduct of illegal

14   retaliation.  This is critical because the December 3, 2009, Oral Warning is

15   referenced in Rodriguez-Malfavon's June 2010 negative evaluation and in a future

16   oral warning given by Defendant Wilbur in May, 2011.  Stated otherwise, if the

17   December 3, 2009 Oral Warning is removed from Rodriguez-Malfavon's file

18   because it violates Title VII, then the 2010 unsatisfactory evaluation falls, the May

19   2011 Oral Warning falls, and the June, 2011 unsatisfactory evaluation based on the

20   May, 2011 Oral Warning must fall.  Since these documents are the basis for

21   Rodriguez-Malfavon's demotion the demotion must fall too.

22           Rodriguez-Malfavon denies the allegations contained in the December 3,

23   2009 Oral Warning.  (¶ 10.)  More important, Rodriguez-Malfavon believes the

24   Oral Warning was issued in retaliation for contacting Tollen's supervisor and

25   CCSD Affirmative Action Officer Tom Rodriguez regarding her concerns.  As

26   Tollen herself said, in Tollen's mind it was insubordination to complain to anyone

27   but her.  (¶ 10.)

28                                          **7**

1   Rodriguez-Malfavon continued to work in Purchasing doing the best she
2   could do.  On March 11, 2010 she received another Summary of Conference from
3   Al Ringhofer.  (Exh. 10.)  She responded to each point Ringhofer raised and denies
4   she did anything wrong.  (¶ 10.)
5        On June 24, 2010 Rodriguez-Malfavon received her first unsatisfactory
6   evaluation.  (Exh. 11.)  The document appears to rewrite history, claiming that
7   "[f]rom day one in the department she has been more concerned with documenting
8   perceived slights and the behavior of others (as discussed in a summary of
9   conference dated November 9, 2009) rather than looking to increase her knowledge
10  and responsiblities and, consequently, her value to the department."  This statement
11  totally contradicts the satisfactory evaluation Rodriguez-Malfavon received in
12  June, 2009, and the fact that there were no documented problems with Rodriguez-
13  Malfavon until she dared to request a transfer in October, 2009.  In any even,
14  Rodriguez-Malfavon denies the allegations set forth in the 2010 annual evaluation
15  and asserts that it was issued in retaliation for her complaining about
16  discrimination by Tollen.  (¶ 11; Exh. 12.)
17       In August, 2010, Rodriguez-Malfavon was transferred from Purchasing to
18  the area supervised by Associate Superintendent Goldman, the Education Services
19  Division ("ESD").  As Goldman recalled, Tollen called him and asked him to do
20  her a favor by taking the Plaintiff into his division.  This would be a "gift" in that
21  she would come with her position, so Tollen would be losing a position and
22  Goldman would be gaining a position.  (Goldman, 32:3-25, Exh. 24).
23       When asked by Goldman why she was making this request Tollen's answer
24  demonstrates retaliatory animus:
25            Q.  Dr. Goldman, you indicated that Ms. Tollen called you and asked
26       you if you would take Ms. Rodriguez?
27            A.  Yes, out of the blue, absolutely.
28                                            **8**

Q.  An then I think previously you testified that she had said that Ms. Rodriguez was trouble?

A.  Yes.  **When I asked her why – I – I had no idea why she was asking me to take her, that's when she said she was just trouble and  – I don't remember exactly what she said, but words to the effect that she was just tired of dealing with all the issues**.  Goldman Dep. 34:20 - 35:4 (emphasis added).

In August, 2010, just weeks after giving Rodriguez-Malfavon an unsatisfactory evaluation, "out of the blue," Tollen tells Goldman Rodriguez-Malfavon is "trouble" and asks him to take her and her position.  When Rodriguez-Malfavon requested a transfer in October, 2009, Tollen told her it couldn't happen, and yet in August, 2010, Tollen just picked up the phone and made it happen.  Calling her "trouble" indicates Tollen was biased against Rodriguez-Malfavon because she went over her head and complained about discrimination.  This is admissible evidence to prove retaliatory motive on Tollen's part.

Having been tagged with an unsatifactory annual evaluation and stigmatized with the label "trouble" Rodriguez-Malfavon was off to a new job as a Coordinator III at the Academy for Individualized Study ("AIS") under Principal Defendant Anita Wilbur.  While Rodriguez-Malfavon did not realize it at the time, this was equivalent to going from the pot to the frying pan, as Wilbur had a history of unethically and illegally surrepticious spying on teachers, staff, students and parents.

Shortly after arriving at AIS Rodriguez-Malfavon learned that Wilbur had installed audio-video cameras throughout the campus which enabled her to surrepticiously observe and listen to what was taking place.  Several employees complained to Rodriguez-Malfavano about the cameras in their offices, the front office and even in Wilbur's office.  It was an open secret that Wilbur was paranoid

and spying on everyone.  Wilbur's use of cameras to surreptitiously monitor employees, students and/or their parents violated both Nevada law[2] as well as federal laws dealing with student privacy.  The cameras were even monitoring the counselor who was assigned to advise disabled children and their parents about their needs.  (¶ 13.)

Rodriguez-Malfavon tried to raise the issue of the cameras with Wilbur on several occasions to no avail.  On March 31, 2011, Rodriguez-Malfavon met with Wilbur's supervisor, Isaac Stein, to complain about the cameras.  Less than one month later, on April 28, Stein issued a memo to Wilbur notifying her that there would an investigatory meeting the next day April 29 to discuss "[a]llegations of audio taping employees throughout the work day." (Exh. 13.)  Given Rodriguez-Malfavon's prior complaints about the cameras it is logical to presume that Wilbur blamed her for instigating Stein's request for an investigatory meeting to talk about audio taping.

The April 29 investigatory meeting resulted in a Summary of Conference which was issued to Wilbur on May 19, 2011.  (Exh. 14.)  As of that date Rodriguez-Malfavon had not received anything in writing indicating that her performance under Wilbur was an issue.  That quickly changed.  On May 26, 2011 Wilbur issued an Oral Warning Summary to the Plaintiff referencing issues dating back to February that had never been mentioned to Rodriguez-Malfavano before. (Exh. 15.)

The email chain that led to this "Oral" warning is instructive.  (Exh. 16.) According to the emails, the Oral Warning was created by Wilbur, Fran Juhasz, and Goldman between May 20 and May 26.  Obviously this time frame is suspicious since Wilbur was questioned about the cameras on April 29, and was

---

[2]  NRS 200.650

issued the Summary of Conference on May 19.  To the extent that Wilbur didn't blame Rodriguez-Malfavon for the Summary of Conference she received, that argument is defeated by a reference Wilbur made on May 20 to the Summary of Conference, directive #6, which states that she must not "take any retaliatory action against any employee."  (Exh. 14; Exh. 16, Bate #CCSD 336.)  In her email Wilbur states, "I also need you to be aware of what I received yesterday.  Please refer to directive Item # 6."  Presumably Wilbur would not be concerned that the Oral Warning she was drafting to be issued to Rodriguez-Malfavon would constitute "retaliatory action" unless she believed Rodriguez-Malfavon was behind the complaint about audio recording.

The email chain is also instructive because it shows Goldman, the Associate Superintendent of ESD, was directly involved in the decision to issue the Oral Warning to the Plaintiff.  On May 24, Juhasz wrote to Wilbur:

> I'm working with Dr. Goldman on this.  Per Dr. Goldman, please do not do ANYTHING further until I hear back from him.  He's going to review the document and then give me his final determination.  We can't mail anything out or give her anything until we hear from him.  Exh. 15, #CCSD 316.

Clearly Goldman was up to his eyeballs in what Wilbur was doing to Rodriguez-Malfavon.

The Oral Warning issued to Rodriguez-Malfavon on May 26 was quickly followed up by a second negative Annual Evaluation based on that Oral Warning. (Exh. 17.)  The email chain reflecting how this document was prepared is also instructive.  (Exh. 18.)  First, the evaluation was directed by Juhasz who states, "it should be an 'unsat,' with at least one of the areas receiving a '1' evaluation."  Exh. 18, Bates #CCSD 2170.

Second, Goldman is once again intimately involved in discipline given to a Coordinator III, Rodriguez-Malfavon.  On May 31 Juhasz writes, "we'll have

1   Eddie [Goldman] do a final." Id.  And on June 3 Juhasz writes, "The evaluation is
2   approved by Dr. Goldman for issuing."  (Exh. 18, Bates CCSD 2163.)  Obviously
3   something special was going on for these two high level adminstrators - Juhasz and
4   Goldman - to be intimately involved in Rodriguez-Malfavon's discipline.

5          While Wilbur was disciplining her a separate action against Rodriguez-
6   Malfavon was taking place.  On May 2, 2011, the Plaintiff received an email
7   advising her that her position was being eliminated due to a Reduction in Force.
8   (Exh. 19.)  This decision was made by Goldman.  (Goldman, 19:24 - 20:1.)  Under
9   the union contract in effect at that time when an administrator's position was
10  eliminated she had a right to bump less senior administrators in the same
11  classification.  Given her seniority Rodriguez-Malfavon would have been able to
12  bump less senior administrators and continue in her administrative position.

13         However, after she received the notice that her position was being eliminated
14  on June 16 Rodriguez-Malfavon received her second negative annual evaluation
15  and under the union contract "[a]dministrators who have been twice rated as
16  unsatisfactory within the last two (2) successive contract years will next be reduced
17  in force."  Accordingly, Rodriguez-Malfavon received a second email on June 17
18  changing the explanation for the elimination of her position.  (Exh. 20.)  According
19  to this email Rodriguez-Malfavon would be demoted to a support staff position and
20  she "did not retain a right to return to an administrative position per Article 26 of
21  [the contract]."  Thus the fact that Rodriguez-Malfavon received an unsatisfactory
22  revaluation in Purchasing and a second unsatisfactory evaluation in ESD meant
23  that she lost her adminstrative position and she has been permanently demoted to a
24  support staff position.  However, if in the course of this lawsuit the jury determines
25  that one or both of her unsatisfactory annual evaluations were the result of illegal
26  bias then Rodriquez-Malfavon should be returned to her administrative position.
27         Finally, after she was demoted Rodriguez-Malfavon amended her Charge of

28
                                           12

Discrimination with the EEOC to include the retaliation and demotion she suffered until she was demoted.  A copy of the amended charged is attached as Exhibit 21.

## II.   Response to Defendants' Statement of Undisputed Material Facts[3]

### A.   Rodriguez-Malfavon's Employment History with CCSD.

Rodriguez-Malfavon does not dispute the Defendants' summary of her employment history.  She adds that she received positive annual evaluations every year of her employment until 2010.  (¶ 2.)

### B.   Rodriguez-Malfavon's Transfer to the Purchasing Department

Rodriguez-Malfavon does not dispute the Defendants' statements about her transfer to the Purchasing Department.  She does however point out that she received a favorable annual evaluation in June 2009 six months after her transfer. (¶ 2; PE 1.)

### C.   Rodriguez-Malfavon's Tenure in the Purchasing Department

Rodriguez-Malfavon disputes the Defendants' explanation for why she requested a transfer on October 13, 2009.  As explained above, in addition to the reasons cited in her email to Jeff Weiler Rodriguez-Malfavon felt Tollen was discriminating against her and treating her differently because of her Cuban origin.

---

[3]The Defendants' brief relies upon statements set forth in documents and emails as though those statements were admissible for the truth of the matter asserted.  As the Court recognizes, such statements are hearsay unless and until they are sworn to by the author or unless they are admissible under an exception to hearsay rules.  Inadmisible hearsay statements submitted by the Defendants include Exhibits 10, 11, 12, 13, 14, and 17.  These statements may not be relied upon for the truth of the matters asserted therein.

Notably no sworn authentication from Tollen has been offered by the Defendants.

Because the Defendants Statement of Undisputed Facts is not numbered Rodriguez-Malfavon relies upon her Factual Summary above to identify the facts in dispute.

1

2   **IV.    LEGAL ARGUMENT**

3        **A.    Plaintiff Was Subjected to Unlawful Retaliation in Violation of
           Title VII**

4        The Defendants correctly explain how to establish a prima facie case of

5   retaliation under Title VII.  A Plaintiff must show 1) that she was involved in a

6   protected activity, 2) she suffered a materially adverse employment action, and 3) a

7   causal link between the protected activity and the adverse employment action.

8   Brooks v. City of San Mateo, 229 F.3d 917, 928 (9th Cir. 2000).  However, the

9   Defendants incorrectly assert Rodriguez-Malfavon can't establish the third element

10  -- identifying evidence which if true will support a jury finding of a causal link.

11       Evidence supporting a causal link between Rodriguez-Malfavon's protected

12  conduct and her 2010 negative evaluation comes straight from the horse's mouth --

13  Director of Purchasing Bramby Tollen.  On October 19 when Rodriguez-Malfavon

14  was called to an investigatory interview concerning her innocuous email requesting

15  a transfer, she clearly articulated that she believed Tollen was treating her

16  differently in violation of Title VII.  Although she didn't use the words "national

17  origin," in stating that she was going to file a complaint with the District's

18  affirmative action officer, Tom Rodriguez, everyone understood that.  Indeed,

19  Tollen's summary of Rodriguez-Malvafon's comments shows Tollen knew exactly

20  what the Plaintiff was going to do -- "You feel you have been treated differently

21  since you arrived in Purchasing and are going to talk to Tom Rodriguez about it."

22  (Exh. 4, p. 2.)  This was Rodriguez-Malfavon's first protected activity.

23       Instead of allowing Rodriguez-Malfavon to file her discrimination complaint

24  with Rodriguez, Tollen doubled down and threatened Rodriguez-Malfavon not to

25  go over her head.  In the November 9 Summary of Conference Tollen directed the

26  Plaintiff to "Follow protocol and afford the chain of command an opportunity to

27

28                                          **14**

1    address your concerns before elevating them over your supervising administrator."

2    Id.  To prove her point, Tollen removed Rodriguez-Malfavon from her private

3    office a few days later.  (Exh. 5.)

4         On November 23, 2009, Rodriguez-Malfavon sent an email to Weiler,

5    complaining that Tollen had put her in a cubicle and removed her

6    supervisory/administrative duties and that she had contacted Tom Rodriguez to file

7    discrimination and harassment charges against Tollen.  (Exh. 7.)  This was

8    protected activity because she was entitled to tell Weiler – indeed, she was

9    obligated to tell Weiler – that she believed one of Weiler's subordinates was

10   engaged in discriminatory conduct.  Instead of ignoring Rodriguez-Malfavon's

11   attempt to advise Weiler of what was going on, Tollen lashed out at the Plaintiff by

12   conducting another investigatory interview and accusing her of insubordination for

13   contacting Weiler in violation of the November 9 directive.  (Exh. 8.)

14        Tollen was not satisfied with just removing Rodriguez-Malfavon from her

15   office and supervisory duties.  Tollen also documented her displeasure that

16   Rodriguez-Malfavon was going over her head by placing a disciplinary document

17   in Rodriguez-Malfavon's personnel file.  On December 3, 2009, Rodriguez-

18   Malfavon received a written Oral Warning Conference Summary which

19   documented Tollen's displeasure with the Plaintiff's attempts to complain about

20   discrimination, accusing her of insubordination.  (Exh. 9.)

21        That document clearly identifies Rodriguez-Malfavon's November 23 email

22   to Weiler as one of the "specific facts" which resulted in the discipline, stating "On

23   November 23, 2009, you sent an Interact email to Mr. Jeff Weiler, Chief Financial

24   Officer.  In this email you expressed multiple work related concerns to Mr. Weiler,

25   asking for his assistance on these matters."  Tollen's own words demonstrate that

26   she was disciplining the Plaintiff for complaining about discrimination.  This is

27   clear retaliation.

28                                    **15**

1   Retaliation is a basic concept:  An employee engages in protected conduct,

2   e.g., complains about discrimination and the employer responds by taking negative

3   action against the employee.  In this case, Rodriguez-Malfavon complained that

4   she was being treated differently and harassed by Tollen, and Tollen retaliated

5   against her by removing her from her office and supervisor duties and by placing a

6   disciplinary document in her personnel file.  It doesn't get any simpler than that.

7   Additionally, Tollen made comments which indicate she was biased against

8   Rodriguez-Malfavon because she engaged in protected conduct. When Tollen

9   called Goldman and asked him to transfer Rodriguez-Malfavon to ESD her

10   explanation for that request was that Rodriguez-Malfavon was "trouble."  Labeling

11   an employee who has complained about discrimination as "trouble" or a

12   "troublemaker" is evidence of bias admissible to prove retaliatory intent.  Sayger v.

13   Riceland Foods, Inc., 735 F.3d 1025, 1032 (8 Cir. 2013); Singer v. State of Maine,

14   865 F. Supp. 19, 25 (USDC Maine, 1994).

15   Finally, as the Defendants point out, temporal proximity between the

16   protected activity and the retaliatory conduct constitutes evidence of a causal

17   connection.  The closer the conduct to the activity, the stronger the evidence.  In

18   this case the proximity is clear, the Plaintiff complained, Tollen tried to slap her

19   down, the Plaintiff complained, Tollen issued a written disciplinary document.  It

20   does not get any clearer than that.

21   The larger question is what subsequent discipline can be attributed to

22   Tollen's retaliatory actions.  Rodriguez-Malfavon believes that the unsatisfactory

23   evaluation she received in June, 2010, is directly tied to Tollen's retaliation in the

24   Fall of 2009.  The basis for this connection is clear, the only discipline cited in the

25   negative evaluation is the December 3, 2009 written oral warning.  The other

26   documents and events which are cited are Summaries of Conference which do not

27   constitute discipline according to the District.  (Goldman, 11:18-19.)

28

1        Rodriguez-Malfavon received a positive evaluation in June, 2009.  She had

2   no negative interactions until October, 2009, when she wrote her email requesting

3   a transfer.  A review of the 2010 annual evaluation demonstrates it is Tollen's

4   discipline which supports the finding of unsatisfactory performance.  At the very

5   least, it is a question of fact for the jury as to whether but for Tollen's retaliatory

6   acts Rodriguez-Malfavon's 2010 evaluation would have been satisfactory.

7

8       **B.**    **Rodriguez-Malfavon Was Subjected To First Amendment**

9               **Retaliation When She Complained About Surreptitious Audio and Video Recording**

10       The Defendants correctly set forth the elements necessary for a First

11  Amendment retaliation case.  First, the employee must prove that 1) the conduct at

12  issue is constitutionally protected and 2) it was a substantial or motivating factor in

13  the adverse employment action.  If the employee proves these two elements then

14  the burden shifts to the government to prove that it would have taken the same

15  action even in absence of the protected conduct.  Brewster v. Board of Education

16  of the Lynwood Unified School Dist., 149 F.3d 971; 978 (9 Cir. 1998).

17       Rodriguez-Malfavon can prove that she was disciplined and demoted

18  because she exercised her First Amendment rights when she complained about her

19  principal's use of surveillance audio and video cameras.

20

21            **1.**    **Plaintiff's Complaints Were Constitutionally Protected**

22       The Defendants correctly point out Rodriguez-Malfavon has the burden to

23  prove that her speech was constitutionally protected, and this determination is one

24  of law, not of fact.  "[T]he threshold inquiry is whether the statements at issue

25  substantially address a matter of public concern."  Brewster, 149 F.3d at 978 (9

26  Cir. 1998).  If the employee's speech involves a matter of public concern, then a

27  plaintiff must prove that the employee's interest in expressing herself must

28                                            **17**

outweigh the State's interest in promoting workplace efficiency and avoiding workplace disruption.  Id.

The Defendants assert that the "Plaintiff's complaints to management about the surveillance cameras . . . were nothing more than internal complaints about her supervisor and do not amount to a matter of public concern."  (Def. OSJ Brief, p. 25.)  Nothing could be further from the truth.  Rodriguez-Malfavon was complaining about potential illegal conduct by her supervisor, Defendant Wilbur, who was violating NRS 200.650 and potentially violating Federal student privacy rights.  These same concerns were being raised by other employees at AIS, including the guidance counselors Vallianos and Slaveck.  Indeed, the accusations were serious enough that Wilbur's supervisor, Isaac Stein, called an investigatory conference to discuss Rodriguez-Malfavon's allegations and later issued an Summary of Conference ordering Wilbur not to audio record employees, students and/or parents.  In making her complaints Rodriguez-Malfavon was saving taxpayer funds should someone sue CCSD for Wilbur's unlawful conduct.

This was not a "perceived slight."  This was serious business and Rodriguez-Malfavon was protected for bringing it to Stein's attention.

### 2. Rodriguez-Malfavon's Complaints About Surveillance Cameras Were a Substantial and Motivating Factor in the Employment Actions

Contrary to the Defendants' assertion the evidence is overwhelming that Wilbur retaliated against Rodriguez-Malfavon because of her protected speech.  To support their position the Defendants' hang their hat on Wilbur's testimony that she had been intending to discipline the Plaintiff for months even though there is no documentary support for that proposition.  To the contrary the emails and documents clearly show that Wilbur didn't take any action against the Plaintiff until she was notified on April 28, 2011, that she would be interviewed the next

next about "[a]llegations of audio taping employees throughout the work day." (Exh. 13.)  It is reasonable to assume that Wilbur realized after that meeting that she would be receiving some type of written notice confirming those allegations sometime in May, and in fact on May 19, 2011, she received a Summary of Conference regarding audio taping employees.  (Exh. 14.)  That document also set forth the directive:  **"Do not . . . take any retaliatory action against any employee."**  Id.

Admittedly the April 28 memo did not name Rodriguez-Malfavon as the source for the audio taping complaint, but during their depositions both Wilbur and Stein identified Rodriguez-Malfavon as someone who had complained about Wilbur's audio taping.  (Wilbur, 6:25 - 7:4; Stein, 7:8 - 14.)  Therefore it is reasonable to assume that Wilbur blamed Rodriguez-Malfavon for the fact that she was being accused of audio taping in writing by her supervisor.

That is why there is a direct connection between Rodriguez-Malfavon's First Amendment protected complaints and Wilbur's decision to give her an oral warning (Exh. 15) on May 26 and an unsatisfactory evaluation based upon that oral warning (Exh. 17) on June 6.  Prior to April 28 there was no record that Wilbur was dissatisfied with Rodriguez-Malfavon's performance, after April 28 Wilbur felt obligated to document Rodriguez-Malfavon's poor performance going back several months with both an oral warning and an unsatisfactory evaluation.  Surely this wasn't just coincidence.

Furthermore, when Wilbur received the May 19 Summary of Conference directing her not to "take any retaliatory action against any employee" she pointedly referenced that directive in her email to Fran Juhasz while Wilbur, Juahasz and Goldman were developing the oral warning that Wilbur issued to Rodriguez-Malfavon one week later.  (Exh. 16, #336.)  If Wilbur didn't think Rodriguez-Malfavon was behind the audio taping complaints why would she

1   believe her discipline of Rodriguez-Malfavon might be perceived to be in

2   retaliation for the investigatory interview and summary of conference she received

3   concerning audio taping?  Indeed, Wilbur admitted as much during her deposition:

4   "Q.  Are you saying you were concerned what you were doing to [Rodriguez-

5   Malfavon] might be perceived as retaliatory?  A.  Yes."  (Wilbur, 18:19-21.)

6   The fact is that Rodriguez-Malfavon denies that Wilbur had complained

7   about her performance prior to April 28, 2011.  Wilbur claims she was unhappy

8   with Rodriguez-Malfavo's performance but admittedly didn't document her

9   unhappiness.  Suddenly, after being notified that she was being investigated for

10  audio taping Wilbur decides to issue Rodriguez-Malfavon an oral warning and an

11  unsatisfactory evaluation.  For purposes of summary judgment, the timing can't be

12  ignored and there is a question of fact as to whether one was responsible for the

13  other.

14  **3.      CCSD Would Not Have Taken the Same Action**

15  The undisputed evidence is that Rodriguez-Malfavon complained to Isaac

16  Stein about Wilbur audio taping employees on March 31, 2011, on April 28, 2011

17  Stein notified Wilbur that she was being investigated for audio taping employees,

18  and on May 2 Rodriguez-Malfavon was notified her position was being eliminated

19  due to a RIF.  (Exh. 19.)  Pursuant to that RIF Rodriguez-Malfavon was to be

20  demoted to a non-administrative support staff position.  The Defendants concede,

21  however, that the initial RIF that Rodriguez-Malfavon was selected for would have

22  allowed her to stay in an administrative position due to bumping rights.

23  On June 17, 2011, Rodriguez-Malfavon was given a different explanation

24  for being RIF'd.  (Exh. 20.)  The second RIF was due to receiving two

25  unsatisfactory evaluations in a row and based upon that reason Rodriguez-

26  Malfavon was told that she had no bumping rights - she would be demoted to a

27  support staff position and had no bumping rights.  The basis for this demotion was

28                                         20

1   asserted to be Article 26-2-2 of the union contract even though that section had not

2   been adopted and would not be until August, 2011.

3     Ignoring the first RIF which everyone agrees would not have resulted in the

4   Plaintiff losing her administrative position, the question is whether the second RIF

5   would have taken place absent Rodriguez-Malfavon's protected activity.  Since the

6   second RIF was based on the fact that Rodriguez-Malfavon received two back-to-

7   back unsatisfactory evaluations if Rodriguez-Malfavon can show that the

8   unsatisfactory evaluation she received in June, 2011, was issued in retaliation for

9   her protected activity, she can prove that she wouldn't have been demoted.  Since

10   that is exactly what Rodriguez-Malfavon intends to show she can prove this

11   element.

12

13    **E.**  **Defendants Goldman and Wilbur Are Not Entitled to Qualified**
           **Immunity If They Retaliated Against Rodriguez-Malfavon Due to**
14           **Her First Amendment Protected Activity**

15     The Defendants correctly point out that local government officials are

16   entitled to qualified immunity unless their conduct violates clearly established

17   federal or constitutional rights.  <u>Brewster v. Board of Education of the Lynwood</u>

18   <u>Unified School Dist.</u>, 149 F.3d 971; 977 (9 Cir. 1998).  In the First Amendment

19   context, the Court should look to the balancing test of whether the employee's

20   speech was constitutionally protected.  <u>Id.</u> at 979-80.

21     In this case, this means the Court must weigh Rodriguez-Malfavon's right to

22   bring a potential criminal and civil matter – the audio taping of employees,

23   students and/or parents - to the attention of her principal's supervisor against

24   CCSD's need to maintain order.  This was not a mere disgruntled employee

25   voicing an internal work related complaint.  If Rodriguez-Malfavon's allegations

26   were true CCSD faced huge potential problems if the audio taping was confirmed

27   and known by employees, students and parents.

28                 21

It is instructive to review the document which notified Wilbur she was being investigated.  That notice states that the investigatory meeting will discuss "allegations of audio taping employees throughout the work day."  There is no context under which that is an "insubstantial claim" that would not be protected by the First Amendment.  Indeed, that is exactly the type of whistleblower complaint which the First Amendment is intended to protect.

V.     **CONCLUSION**

As the argument above demonstrates, Rodriguez-Malfavon can show that she was unlawfully retaliated against because she complained about discrimination protected by Title VII and because she complained about serious matters protected by the First Amendment.  Accordingly the Defendants' motion should be denied with respect to the Plaintiff's Title VII and First Amendment retaliation claims.

Dated this 30th day of July, 2015.


　　　　　　　　　 //Richard Segerblom
　　　　　　　　　 RICHARD SEGERBLOM
　　　　　　　　　 700 S. Third Street
　　　　　　　　　 Las Vegas, NV 89101
　　　　　　　　　 Attorney for Plaintiff

22

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of July, 2015, I served the foregoing Opposition to Motion for Summary Judgment by ECF transmission to counsel for the Defendant.

//Richard Segerblom//
RICHARD SEGERBLOM, ESQ.
Attorney for Plaintiff