# EXHIBIT 22

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF NEVADA          CONDENSED

 3                                                     TRANSCRIPT
    ELENA RODRIGUEZ-MALFAVON,        )
 4                                   )
                    Plaintiff,       )   Case No.:  2:12-cv-1673-
 5                                   )              MMD-PAL
                                     )
 6            vs.                    )
                                     )
 7  CLARK COUNTY SCHOOL DISTRICT,    )
    EDWARD GOLDMAN and ANITA         )
 8  WILBUR,                          )
                                     )
 9              Defendants.          )
    _____)

10

11

12

13

14

15

16              DEPOSITION OF ANITA WILBUR

17                  LAS VEGAS, NEVADA

18            THURSDAY, OCTOBER 23, 2014

19

20

21

22  REPORTED BY:  GINA DILUZIO, RPR, CCR #833

23   JOB NO.:  224076

24

25
```

ANITA WILBUR - 10/23/2014

**Page 2**

1    DEPOSITION OF ANITA WILBUR, taken at Law Office of
2  Richard Segerblom, 700 South Third Street, Las Vegas,
3  Nevada, on Thursday, October 23, 2014, at 2:01 p.m., before
4  Gina DiLuzio, Certified Court Reporter, in and for the State
5  of Nevada.
6
7  APPEARANCES:
8  For the Plaintiff:
9          LAW OFFICE OF RICHARD SEGERBLOM, LTD.
           BY:  RICHARD S. SEGERBLOM, ESQ.
10         700 South Third Street
           Las Vegas, Nevada  89101
11         (702) 388-9600
12  For the Defendants:
13         LITTLER MENDELSON, P.C.
           BY:  JAMIE CHU, ESQ.
14              ETHAN D. THOMAS, ESQ.
           3960 Howard Hughes Parkway
15         Suite 300
           Las Vegas, Nevada  89169-5937
16         (702) 862-7716
           jchu@littler.com
17         edthomas@littler.com
18  Also Present:   Elena Rodriguez-Malfavon
19
20
21
22
23
24
25

**Page 3**

1              I N D E X
2  WITNESS:  Anita Wilbur
3  EXAMINATION                                    PAGE
4     By Mr. Segerblom                              4
5     By Ms. Chu                                   39
6  FURTHER EXAMINATION
7     By Mr. Segerblom                             42
8     By Ms. Chu                                   46
9
10              E X H I B I T S
11  NUMBER                                      MARKED
12  Exhibit 1     Memo                             5
13  Exhibit 2     CCSD Record Of Personnel         7
                  Notification
14
    Exhibit 3     Series of e-mails               10
15
    Exhibit 4     CCSD Record Of Personnel        14
16                Notification
17  Exhibit 5     CCSD Performance Evaluation      33
                  Report - Central Office
18                Administrator
19
20
21
22
23
24
25

**Page 4**

1            LAS VEGAS, NEVADA, THURSDAY, OCTOBER 23, 2014
2                          2:01 P.M.
3                            -oOo-
4  Thereupon--
5                       ANITA WILBUR,
6  was called as a witness, and having been first duly
7  sworn, was examined and testified as follows:
8
9                       EXAMINATION
10  BY MR. SEGERBLOM:
11      Q.    Would you state your name, please.
12      A.    Anita Wilbur.
13      Q.    Ms. Wilbur, I know -- well, what's your current
14  status with the Clark County School District?
15      A.    I do not work for the Clark County School
16  District?
17      Q.    Are you retired?
18      A.    Yes.
19      Q.    Can you give me the approximate dates when you
20  did work for the school district.
21      A.    I started in, I think, it was 1981 to 2013.
22      Q.    Okay.  And it's my understanding that you
23  retire -- when you retired, you were principal?
24      A.    Yes, sir.
25      Q.    And when did you first become a principal?

**Page 5**

1      A.    Wow.
2      Q.    Approximately.
3      A.    2003 or '4.
4      Q.    Okay.  And what school were you at?
5      A.    AIS.
6      Q.    So you -- did you start AIS or was AIS already
7  in existence?
8      A.    It was already in existence.
9      Q.    And based to my knowledge, was AIS -- when you
10  first went there, was it on St. Louis?
11      A.    Yes.
12      Q.    And then did it transfer to Western?
13      A.    Yes.
14      Q.    And then it went to Gorman?
15      A.    Yes.
16      Q.    Okay.  And then it went to Channel 10?
17      A.    Yes.
18      Q.    Okay.
19      A.    Every year.
20      Q.    A moving high school.
21            (Exhibit 1 marked.)
22  BY MR. SEGERBLOM:
23      Q.    All right.  I'm going to show you what's been
24  marked as Exhibit 1.  Have you seen Exhibit 1 before?
25      A.    Yes.

ANITA WILBUR - 10/23/2014

Page 6

1    Q.    And is that your signature at the bottom?
2    A.    Yes.
3    Q.    Do you recall receiving Exhibit 1 on, I guess,
4  April 28 of 2011?
5    A.    Correct.
6    Q.    Were you told you were going to be given this
7  or did Mr. Stein just show up and ask you to sign for it?
8    A.    He just showed up an asked me to sign for it.
9    Q.    And then, apparently, based on Exhibit 1, there
10  was a meeting -- I'm not sure where it was, but there was a
11  meeting, the next day, on the 29th of April?
12    A.    The -- I think so, yes.
13    Q.    Looking at the three al -- th the Exhibit 1
14  mentions three issues that were to be discussed on the
15  29th.
16          First, was allegations of audiotaping
17  employees throughout the work day, unprofessional treatment
18  of current staff, and adherence to banking practices.
19    A.    Uh-huh.
20    Q.    With respect to Exhibit 1, No. 1, allegations
21  of audiotaping employees, had you heard -- had that issue
22  come up before you received Exhibit 1?
23    A.    Isaac had come to my office and asked me if --
24  if the -- the cameras did audio tape and I told him "no."
25    Q.    Okay. Were you aware of any employees that

Page 7

1  worked for you who had raised concern about audiotaping?
2    A.    Ms. Malfavon had asked me if I had -- or I had
3  checked with legal and I told her I had gone through that
4  process already.
5    Q.    Okay.
6    A.    In previous conversations when, I couldn't tell
7  you.
8    Q.    Okay. All right. When you met on the 29th,
9  did Mr. Stein -- and you talked about the audiotaping issue,
10  did he mention any employees who had complained to him?
11    A.    No.
12    Q.    Exhibit 2 --
13          (Exhibit 2 marked.)
14  BY MR. SEGERBLOM:
15    Q.    I'd like you to look at Exhibit 2.
16    A.    Where do you want this one? Okay. Sorry.
17    Q.    Look at that and I'll ask you some questions.
18  I apologize for the -- the signatures appear to be -- well,
19  the signatures are unrecognizable, but...
20    A.    Okay.
21    Q.    All right. Do you recognize Exhibit 2?
22    A.    Yes.
23    Q.    Okay. And this appears to be a summary of a
24  conference that was given to you on May the 19th, 2011?
25    A.    That's correct.

Page 8

1    Q.    And it's your understanding this was -- you
2  received this based upon the meeting that was held on April
3  29th?
4    A.    That's correct.
5    Q.    And even though you can't see your signature --
6    A.    Oh. It's there. I can see it. Basically,
7  scratched.
8    Q.    And do you believe you received it on the 19th?
9    A.    I think so.
10    Q.    And the supervising administrator's signature
11  is also --
12    A.    Yes.
13    Q.    -- faint. Do you remember who gave it to you?
14    A.    Yes. Isaac Stein.
15    Q.    All right. Now, in this document, second
16  paragraph, it reads, "With regard to the audiotaping of
17  employees, you stated that absolutely no employees were or
18  are being audio taped." Period.
19    A.    Is that a question?
20    Q.    No. I just --
21    A.    Oh. Sorry.
22    Q.    I just wanted to read the statement to you. My
23  question is --
24          MS. CHU:  You're fine.
25  BY MR. SEGERBLOM:

Page 9

1    Q.    -- is that what you stated?
2    A.    Yes.
3    Q.    Now, my understanding is, there was cameras
4  throughout AIS?
5    A.    Yes.
6    Q.    Okay. And did you have access to what was seen
7  by those cameras in your office?
8    A.    Just the front office.
9    Q.    Okay.
10    A.    Just the -- the library area.
11    Q.    Okay. And, approximately, how many cameras
12  would that have been?
13    A.    I have no idea.
14    Q.    Okay.
15    A.    Couldn't tell you.
16    Q.    Now, setting aside the issue whether you were
17  tape recording the conversations, could you hear
18  conversations?
19    A.    No.
20    Q.    No. So, to your knowledge, the microphones
21  that may or may not have been in those cameras were not
22  utilized?
23    A.    They were not utilized.
24    Q.    And that's what you told Mr. Stein?
25    A.    That's correct.

ANITA WILBUR - 10/23/2014

Page 10

1    Q.    Okay.
2          (Exhibit 3 marked.)
3 BY MR. SEGERBLOM:
4    Q.    All right.  Show you what's been marked as
5 Exhibit 3.
6          MS. CHU:  That's not 3.
7          MR. SEGERBLOM:  Oh.  I'm sorry.  I was going to
8 say I didn't think that was Exhibit 3.  Getting ahead of
9 myself.  Sorry about that.
10 BY MR. SEGERBLOM:
11   Q.    Show you what's marked as Exhibit 3.  And I'll
12 represent to you that these -- Exhibit 3 are -- is,
13 approximately, 30 pages that are Bates-stamped 309 through
14 339.
15         And they appear to be Xeroxes of e-mails that
16 took place between May 24, 2011 and May 27, 2011.
17   A.    Okay.
18   Q.    And feel free to take your time to look at it.
19   A.    Oh.  You want me to look at all of them?
20   Q.    Well, you don't have to.  I just --
21         MS. CHU:  I would prefer that you did before he
22 asks you questions.
23         THE WITNESS:  Okay.
24         MS. CHU:  They're short.
25         MR. SEGERBLOM:  A lot of them are duplicative.

Page 11

1 It's basically a conversation back and forth.
2          THE WITNESS:  (Complied.)
3          (Pause in the proceedings.)
4          (Recess taken from 2:14 p.m. to 2:24 p.m.)
5 BY MR. SEGERBLOM:
6    Q.    Did you have a chance to look at Exhibit 3?
7    A.    I did.
8    Q.    All right.  Would you agree with the
9 characterization that this is primarily a series of e-mails
10 between you and Fran Juhasz concerning my client,
11 Ms. Rodriguez?
12         MS. CHU:  Objection.  The documents speak for
13 themselves.
14 BY MR. SEGERBLOM:
15   Q.    You can answer.
16         THE WITNESS:  I can?
17         MS. CHU:  Uh-huh.
18         THE WITNESS:  I didn't know I could.  Yes, I
19 do.
20 BY MR. SEGERBLOM:
21   Q.    I'd like to -- to then question you about what
22 prompted this.  Based on the e-mails, it appears that you
23 decided -- determined that Ms. Rodriguez should be given an
24 oral warning?
25         MS. CHU:  And then just to clarify.  You're

Page 12

1 talking about the series of e-mails --
2          MR. SEGERBLOM:  Right, right,
3          MS. CHU:  -- but not a specific question on one
4 specific e-mail?
5          MR. SEGERBLOM:  Right.
6          MS. CHU:  Oh.
7 BY MR. SEGERBLOM:
8    Q.    The e-mails refer to the process of preparing a
9 written oral warning.  Is this --
10         MS. CHU:  Objection.  The documents speak for
11 themselves.
12 BY MR. SEGERBLOM:
13   Q.    You can go ahead and answer.
14   A.    Okay.  Sorry.  Yes.
15   Q.    So my question is, when, if you recall, did you
16 first decide that it was -- that you wanted to give her an
17 oral warning?
18         MS. CHU:  Objection.  Calls for speculation.
19         MR. SEGERBLOM:  I don't think that's
20 speculation.
21 BY MR. SEGERBLOM:
22   Q.    But if you don't recall, you don't have to
23 say.
24   A.    Okay.  I do recall.
25   Q.    Okay.

Page 13

1    A.    It was probably back in January, February.
2    Q.    Okay.  And, at that point, you don't recall why
3 you waited until May to give her the oral warning?
4    A.    Because I was trying to work with Isaac and get
5 his support on this.
6    Q.    Okay.
7    A.    Because I had -- sorry.
8    Q.    That's fine.  So you and Mr. Stein had talked
9 about giving Ms. Rodriguez an oral warning?
10   A.    No.
11   Q.    Had you -- you said get his support on this.
12 What -- you had talked about Ms. Rodriguez, in general, you
13 and Mr. Stein?
14   A.    Yes.
15   Q.    Back in January?
16   A.    Yes.
17   Q.    And did that conversation continue up until
18 this series of e-mails, which was in May?
19   A.    Yes.
20   Q.    Okay.  Was there a point which you said to him
21 or he said to you, I think we should give her an oral
22 warning?
23   A.    No.
24   Q.    Okay.  This series of e-mails refers to the
25 preparation of an oral warning.  Did you obtain Mr. Stein's

ANITA WILBUR - 10/23/2014

1  approval before you started that process?
2        MS. CHU: Objection. Vague.
3        THE WITNESS: I -- I -- say that again.
4  BY MR. SEGERBLOM:
5        Q.    All right. That was unclear. Did you ask
6  Mr. Stein if you could give Ms. Rodrigues an oral warning?
7        MS. CHU: Objection. Lacks foundation.
8  BY MR. SEGERBLOM:
9        Q.    Let's do it this way. I'm going to hand you
10  what's marked as Exhibit 4. And just keep Exhibit 3 and
11  Exhibit 4.
12        A.    Okay.
13              (Exhibit 4 marked.)
14  BY MR. SEGERBLOM:
15        Q.    Because we'll refer to both of them. And would
16  you agree that Exhibit 4 is the oral warning?
17        A.    I haven't read --
18        Q.    Oh. I'm sorry.
19        A.    -- Exhibit 4, so I'm going --
20        Q.    Okay. Go ahead.
21        A.    Unless it's in here.
22        Q.    It is, but that's fine. Go ahead and look at
23  it again.
24        A.    Oh. Okay. I -- yeah, I remember it now.
25  Okay. Okay. Sorry.

1        Q.    That's fine. So would you agree that Exhibit
2  4, which is an oral warning that was given to Ms. Rodrigues,
3  is the document which resulted from the e-mails, which is
4  Exhibit 3?
5        A.    Yes.
6        Q.    Okay.
7        A.    Not totally, but, yes.
8        Q.    Okay. All right. So my question is, did you
9  ask Mr. Stein's approval before you gave Ms. Rodrigues
10  Exhibit 4?
11        A.    No.
12        Q.    Okay. Did you ask anyone's approval?
13        A.    Yes.
14        Q.    Whose approval did you ask?
15        A.    Fran Warhead -- Juhasz. Sorry.
16        Q.    Warhead. That's a fun nickname.
17        A.    I say her name wrong every time.
18        Q.    That's okay.
19        A.    Sorry.
20        Q.    She's a lawyer.
21        A.    Yeah.
22        Q.    All right. And it's your understanding that
23  that was the proper protocol, you didn't have go to your
24  supervisor to get permission to give an oral warning to one
25  of your employees?

1        A.    Yeah. She told me that.
2        Q.    Okay. And was she allowed to give you the
3  authorization by herself?
4        MS. CHU: Objection. Calls for speculation.
5  BY MR. SEGERBLOM:
6        Q.    If you know.
7        A.    Don't know.
8        Q.    Well, let me ask you this. When you approached
9  her and asked if you could give Ms. Rodrigues an oral
10  warning, did she indicate you could or did she say, I have
11  to talk to somebody, if you recall?
12        A.    I don't recall. I don't recall.
13        Q.    All right. All right. Now, Exhibit 3 also
14  includes some e-mails with Dr. Goldman; is that correct?
15        A.    Uh-huh.
16        Q.    Is that a "yes"?
17        A.    Yes. I'm sorry. Yes.
18        Q.    That's okay. Do you know how he happened to
19  get involved in the process of giving --
20        A.    Not a clue.
21        Q.    Okay. So in these e-mails, it appears
22  Ms. Juhasz was communicating with Dr. Goldman. And you
23  don't know how that happened?
24        A.    I do not know.
25        Q.    Okay. If you could, go ahead and turn to the

1  document which is Bates-stamped 336.
2        A.    (Complied.)
3        Q.    It's at the very bottom, because the last
4  document was 339.
5        MS. CHU: Look at these.
6        THE WITNESS: Oh. I see at the bottom. I'm
7  sorry. I didn't --
8        MS. CHU: Bates-stamped.
9        MR. SEGERBLOM: It's our legal --
10        THE WITNESS: I was looking for March. Sorry.
11  BY MR. SEGERBLOM:
12        Q.    All right. Exhibit -- well, document 336 of
13  Exhibit 3 is an e-mail apparently from yourself to
14  Ms. Juhasz. And it references five attachments?
15        A.    That's correct.
16        Q.    Okay.
17        A.    Based on -- yes.
18        Q.    And I believe the attachments are actually
19  documents before -- probably starting with 331.
20        A.    Yeah. That's correct. Yes. More than likely.
21        Q.    Okay. And, specifically, I want to reference
22  you to Bates stamp 335 --
23        A.    (Complied.) Okay.
24        Q.    -- which is the summary of conference we just
25  talked about.

ANITA WILBUR - 10/23/2014

```
 1    A.    Okay.
 2    Q.    All right.  Now, in Exhibit -- on page 336, the
 3  last line, you say, and I quote, "I also need you to be
 4  aware of what I received yesterday."  Period.  "Please refer
 5  to directive item #6."
 6    A.    Yes.
 7    Q.    And then if you turn to 335, Exhibit (sic) 6 --
 8  which I'm not sure that was circled by you or that has been
 9  done subsequently -- Exhibit 6 reads, "Do not discuss these
10  allegations with employees or take any retaliatory action
11  against any employee."
12    A.    That's correct.
13    Q.    Why did you refer to that item 6 in your
14  e-mail, which is page 336?
15    A.    Because of my concerns that -- ongoing concerns
16  that I've already documented of her inappropriate completion
17  of her job responsibilities and would it be a retaliatory
18  action versus a retaliatory action.
19    Q.    Are you saying you were concerned that what you
20  were doing to her might be perceived as retaliatory?
21    A.    Yes.
22    Q.    Did Ms. Juhasz ever respond to that inquiry?
23    A.    I don't -- if she -- if it's not in writing, I
24  don't remember.
25    Q.    Okay.  And, so, I think your testimony is, was
```

```
 1  Mr. Stein totally unaware that you and Ms. Juhasz were
 2  preparing this oral warning?
 3    MS. CHU:  Objection.  Calls for speculation.
 4  BY MR. SEGERBLOM:
 5    Q.    Well, to your knowledge, was Mr. Stein unaware
 6  that you and Ms. Juhasz were preparing the oral warning for
 7  Ms. Rodriguez?
 8    A.    Mr. Stein, I don't know.
 9    Q.    Okay.  How about Mr. Waldron?
10    A.    Yes.
11    Q.    Yes, he was aware?
12    A.    Yes, he was aware.
13    Q.    Okay.  How do you know he was aware?
14    A.    Because I told him.
15    Q.    All right.  Given this process, do you recall
16  when you would have told him, approximately?
17    A.    Hmm.  I don't remember exact, the date, but I
18  think it was in February.
19    Q.    Okay.  All right.  So you told Mr. Waldron,
20  back in February, that you were planning to give
21  Ms. Rodriguez an oral warning?
22    A.    I was lining up my ducks, yes.
23    Q.    Okay.  All right.  And what was his response?
24    A.    He didn't say much.
25    Q.    Okay.  But you also said, I think, that you
```

```
 1  were working with Mr. Stein to get his approval?
 2    A.    No.  You implied Mr. Stein had a conversation.
 3  I never said Mr. Stein's name.
 4    MR. SEGERBLOM:  Okay.  All right.  Can we go
 5  back and see.  I thought several questions ago, I had asked
 6  if Mr. Stein had approved this.  And she indicated that back
 7  in January, she had talked to Mr. Stein.
 8    A.    In March, I spoke with Mr. Stein.
 9    (Questions and answers on page 13, lines 11 to
10  16, read back.)
11  BY MR. SEGERBLOM:
12    Q.    So you testified you were trying to work with
13  Mr. Stein to get his approval?
14    A.    Well --
15    Q.    Is that correct?
16    A.    I didn't understand it like that.  So ask --
17    Q.    How did you understand it?
18    A.    I -- I thought you were asking me whether I was
19  asking him for his approval and I didn't -- wasn't asking
20  for his approval.
21    What I was doing was setting -- Brad told me --
22  basically said, work with Isaac.  So I was working with
23  Isaac.
24    Q.    And I guess that's what my question is.  If you
25  were working with Isaac, why didn't you go to him before you
```

```
 1  started preparing the oral warning?
 2    A.    I asked Isaac to meet with me on three
 3  different occasions.  He failed to show up or call and --
 4  and did not show up on two occasions.  On the third
 5  occasion, he finally showed up on March 31.
 6    Q.    Okay.  And, at that time, did you discuss
 7  Ms. Rodriguez in an oral warning?
 8    A.    Ms. Rodriguez was at that meeting.
 9    Q.    Okay.  All right.  But you did talk to
10  Mr. Waldron about giving her an oral warning?
11    A.    That's correct.  Previous to that date.
12    Q.    Right.  Did he agree or he just --
13    A.    He didn't -- he just said, work with Isaac.
14    Q.    All right.  And then, at some point, you
15  determined that you would just go directly to Ms. Juhasz?
16    A.    It was probably before then.
17    Q.    Okay.  All right.  Do you have any notes or
18  prepared notes, at the time, that contain the matters that
19  are in Exhibit 4?
20    MS. CHU:  Objection.  Vague.
21  BY MR. SEGERBLOM:
22    Q.    Well, actually, I apologize.  We'll get to that
23  in a second.
24    All right.  So, now, are you familiar with any
25  other time where you were given some type of disciplinary
```

ANITA WILBUR - 10/23/2014

Page 22

```
1   document, oral warning, reprimand, evaluation, where
2   Mr. Goldman had been involved?
3       A.    No.
4       Q.    So this -- as far as you know, this was unusual
5   for Mr. Goldman to be involved in this oral warning?
6           MS. CHU:  Objection.  Misstates testimony.  If
7   you're confused, make sure you ask him what he's talking
8   about before you answer.
9           THE WITNESS:  Yeah.  Go back to that last
10  question, because I -- you mumbled and I wasn't sure if you
11  said --
12  BY MR. SEGERBLOM:
13      Q.    All right.
14      A.    I don't know who you're talking about.
15      Q.    All right.
16      A.    I guess that's what I'm talking about.
17      Q.    All right.  We earlier talked about Exhibit 3
18  and the fact that Dr. Goldman was apparently involved in the
19  decision to give my client an oral warning.
20          MS. CHU:  Objection.  Lacks foundation.  But
21  you can keep going.
22  BY MR. SEGERBLOM:
23      Q.    Did you understand the question?
24      A.    I don't -- okay.  Say it one more time.
25      Q.    Okay.  Exhibit 3 --
```

Page 23

```
1       A.    Right.
2       Q.    -- is a series of e-mails --
3       A.    Oh.  This one.  Okay.  I was looking -- sorry,
4   sorry, sorry.
5       Q.    Exhibit 3 is a series of e-mails between you
6   and Ms. Juhasz concerning the preparation of an oral warning
7   which was given to my client, Ms. Rodriguez.
8       A.    I understand that.
9       Q.    Okay.  And based upon the e-mails, it appears
10  that Dr. Goldman was involved in that process also?
11      A.    I --
12          MS. CHU:  Objection.  Calls for speculation.
13  She already said she didn't know why Dr. Goldman was --
14          MR. SEGERBLOM:  I didn't ask why.  I said it
15  appears that he was involved.
16          MS. CHU:  Yeah.  But you're asking her to agree
17  with your statement.  She doesn't have --
18  BY MR. SEGERBLOM:
19      Q.    Well, look, you can't see it from the
20  e-mails --
21      A.    I can see that Dr. Goldman had e -- had
22  copies -- had access to some of these e-mails, but I
23  can't --
24      Q.    Well, let's look at page 316.
25      A.    (Complied.)  Okay.  Sorry.  I keep still
```

Page 24

```
1   looking for the date.
2       Q.    All right.  Bates stamp 316 of Exhibit 3 is an
3   e-mail from -- well, the top of it is an e-mail from
4   yourself to Fran Juhasz, dated May 24.
5           But below, the bottom of the e-mail, Ms. Juhasz
6   writes to you, "Anita, thanks for the quick turnaround.  I'm
7   working with Dr. Goldman on this.  Per Dr. Goldman, please
8   do not do ANYTHING further until I hear back from him."
9       A.    Okay.
10      Q.    All right.  Do you agree that that -- you
11  received that e-mail?
12      A.    I received the e-mail.
13      Q.    So would you agree that -- that based on
14  Ms. Juhasz's statement to you, that Dr. Goldman was involved
15  in this process of issuing the oral warning?
16          MS. CHU:  Objection.  Calls for speculation.
17  Assumes facts not in evidence.  You can answer, if you know.
18          THE WITNESS:  Oh.  I don't -- I didn't know
19  whether he was in -- I didn't know that he was involved.
20  BY MR. SEGERBLOM:
21      Q.    But Ms. Juhasz told you she (sic) was.  Whether
22  her statement is true or not, you based that --
23      A.    Whether her statement is true or not, it's in
24  print.
25      Q.    Right.  And you received that e-mail?
```

Page 25

```
1       A.    I received this e-mail.
2       Q.    All right.  And my question is, have you ever
3   received an e-mail similar to that where you were told that
4   Dr. Goldman was involved in some type of discipline that you
5   preparing for your one of your subordinates?
6       A.    I --
7           MS. CHU:  Objection.  Lacks foundation.  I
8   think you have to ask her whether or not she's written
9   anyone else up and if she went to Fran for the process
10  before she can answer your question.
11          MR. SEGERBLOM:  I don't object to it at all.  I
12  just asked the question.
13  BY MR. SEGERBLOM:
14      Q.    To your knowledge, has Dr. Goldman been
15  involved in any discipline which you gave to another
16  employee?
17      A.    I don't -- I don't know.  I can't -- I --
18      Q.    You don't know, right?
19      A.    I don't know.
20      Q.    All right.  That's fine.  That's a perfect,
21  simple answer.
22      A.    Okay.  I don't know.
23      Q.    All right.  All right.  Then let's look at
24  Exhibit 4.
25      A.    (Complied.)
```

ANITA WILBUR - 10/23/2014

**Page 26**

1    Q.    Now, Exhibit 4 is an oral warning summary which
2  was given to my client, Ms. Rodriguez, I believe, by
3  yourself.  Would you agree with that?
4    A.    That's correct.
5    Q.    Okay.  And that's your signature at the bottom?
6    A.    Uh-huh.
7    Q.    Is that a "yes"?
8    A.    I'm sorry.  Yes.
9    Q.    Now, in Exhibit 6 -- I'm sorry -- Exhibit 4,
10 you refer to certain incidents and, specifically, I'll point
11 out that -- about the fourth paragraph down, it says, "On
12 February 28, 2011."
13   A.    Uh-huh.
14   Q.    Now, do you -- when you prepared Exhibit 4, did
15 you have any notes that were prepared back on February 28
16 that you referred to?
17   A.    What do you mean by "notes"?
18   Q.    Well, anything.  How did you know that
19 something happened on February 28 when you prepared this
20 document in May?
21   A.    Well, I probably went off my meeting schedule
22 and we -- for the -- any time we did a training for a
23 specific thing, they had to sign in, if it was something
24 important.  And Dennis had the sign-in sheet.
25         And if he -- if an employee wasn't there, he

**Page 27**

1  was directed by me to go run around and train the employee,
2  one on one, and follow up with all employees, one on one.
3    Q.    Okay.  My question is just basically --
4    A.    I'm sorry.
5    Q.    -- how did you recall that the date was
6  February 28, 2011?
7    A.    Because of the documentation Dennis must have
8  had.
9    Q.    Okay.
10   A.    I don't recall anything else.  I mean...
11   Q.    But you believe you that documentation --
12   A.    I do believe I had that.
13   Q.    -- when you prepared this in May?
14   A.    That's correct.
15   Q.    And you don't know where that documentation is
16 today?
17   A.    No.
18   Q.    Okay.  That's fine.  All right.  Now, you also
19 refer down below to -- and this would be the second
20 paragraph from the bottom -- to issue about fire keys?
21   A.    That's correct.
22   Q.    Did you have any documentation about fire keys
23 that you referred to when you prepared Exhibit 4?
24   A.    Yes, I did.
25   Q.    Okay.  And do you know where that documentation

**Page 28**

1  is today?
2    A.    I've seen it.  There were notes from a
3  September meeting -- September meeting.  Oh, dear.  I think
4  it's in my calendar.  I'm not sure.
5    Q.    Is that something you would have, personally,
6  or is that something you gave to the district?
7    A.    I gave it to --
8         MS. CHU:  You're talking about the calendar
9  that you provided us?
10        THE WITNESS:  Uh-huh.
11        MS. CHU:  Yeah.
12        THE WITNESS:  Uh-huh.
13        MS. CHU:  -- which we produced in this case.
14        THE WITNESS:  Yeah.
15        MR. SEGERBLOM:  All right.
16        THE WITNESS:  There were two meetings that we
17 had about the fire keys.  And then there with a memo --
18 yesterday's memo had about the fire keys, that she ordered
19 the fire keys.
20        And there was -- that was right after I had
21 requested her to -- directed her to follow through and order
22 those things.
23 BY MR. SEGERBLOM:
24   Q.    Okay.  That's my question.  So you, personally,
25 directed her to order the fire keys?

**Page 29**

1    A.    Uh-huh.
2    Q.    Is that a "yes"?
3    A.    Uh-huh.  Yes.  Sorry.
4    Q.    Okay.  All right.  And do you have notes about
5  when you directed her to do that?
6    A.    I think they're in my calendar.  I don't
7  recall.  I haven't looked in my calendar in year -- probably
8  a few months.
9    Q.    All right.  But if you did keep notes, that
10 would have been in your calendar?
11   A.    Yes, sir.
12   Q.    Okay.  All right.  Now, the last item on the
13 first page, refers to a shelter-in-place bins.
14   A.    Yes, sir.
15   Q.    Now, did you have notes concerning the
16 shelter-in-place bins?
17   A.    I think so.
18   Q.    Okay.  And would that also be in your calendar?
19   A.    Probably.
20   Q.    Now, to my knowledge, none of the items listed
21 on Exhibit 4 were given in any type of memo to my client
22 saying you failed to do this or you didn't do that at the
23 time it occurred.  Would you agree with that?
24   A.    Until I discovered them.  I -- yeah, until I
25 discovered them.

1  Q.  Okay. But I'm saying -- I haven't seen
2  anything in writing from you to her referencing any of these
3  items where you said you didn't issue appraisal on time, you
4  didn't issue the fire keys, you didn't did the
5  shelter-in-place.
6  A.  I don't think she was here when I discovered
7  the fire keys.
8  Q.  Okay. How about the shelter-in-place?
9  A.  I don't recall what the date was.
10  Q.  Okay. How about the -- on the second page, you
11  refer to an evaluation that she failed to do on time.
12  A.  I told her I specifically -- we had a
13  conference about that. She and I had a conference and it's
14  well documented.
15  Q.  Okay.
16  A.  On more than one occasion, because it really
17  encompassed three employees, not the latest one I wrote
18  about.
19  Q.  The previous two, did you write anything about
20  them?
21  A.  No, but we had a conference about those as
22  well.
23  Q.  Okay.
24  A.  We called Denise in EMR about the two. I think
25  it was Vincent and Tabitha. We called Denise in EMR and she

1  said --
2  MR. THOMAS:  Dick, if you could please instruct
3  her not to react to every --
4  MS. CHU:  Yeah, it's really a distraction,
5  actually.
6  MR. THOMAS:  -- question --
7  MR. SEGERBLOM:  What happened?
8  You're embarrassing me?
9  THE PLAINTIFF:  No. I'm trying to --
10  MS. CHU:  If you're getting upset --
11  MR. THOMAS:  She's kind of making faces.
12  THE PLAINTIFF:  Oh. I'm sorry. I wasn't
13  realizing I was. I'm sorry.
14  MR. THOMAS:  You didn't say anything, but...
15  MS. CHU:  You had your chance yesterday to give
16  your story to --
17  MR. SEGERBLOM:  Just stop it. Just stop it.
18  Don't make any faces.
19  THE PLAINTIFF:  No. I'm sorry. I wasn't
20  realizing I was. Sorry.
21  THE WITNESS:  I don't remember where I was
22  sorry.
23  MS. CHU:  Can you read back the last question.
24  BY MR. SEGERBLOM:
25  Q.  I think you were referring to Denise in EMR.

1  A.  Yeah. Okay. We had a phone call from Denise
2  in EMR. What date, I don't know. It's probably in my
3  calendar. I'm not sure.
4  But, basically, she said the -- the evaluations
5  that -- Ms. Malfavon had written were too general. Those
6  were her exact words. And -- and, so, I rewrote them to be
7  more specific.
8  I asked her on the phone while -- the three of
9  us were on the phone -- on Speakerphone, in my office, to
10  Denise in EMR. I asked her, should I write about this,
11  this, this, this? And she said "yes."
12  And that's what the evaluations were then. I
13  had wrote them myself.
14  Q.  Which is your right as Ms. Malfavon's
15  supervisor?
16  A.  That's correct.
17  Q.  Now, in giving Exhibit 4 --
18  THE WITNESS:  Sorry. There's a fly.
19  MR. SEGERBLOM:  Wow.
20  THE WITNESS:  It was flying.
21  MR. SEGERBLOM:  It was. Not anymore.
22  BY MR. SEGERBLOM:
23  Q.  In giving my client Exhibit 4, were you
24  intending to follow that up with a negative evaluation?
25  MS. CHU:  Objection. Calls for speculation.

1  MR. SEGERBLOM:  I'm not sure why it would be
2  speculation.
3  MS. CHU:  I can make my objections. You don't
4  have to comment on it. You can answer.
5  THE WITNESS:  Do I answer? Oh. Okay. Sorry.
6  I don't know. Because I don't know.
7  BY MR. SEGERBLOM:
8  Q.  All right. Then that's the reason for the next
9  question. Let's look at Exhibit 5.
10  (Exhibit 5 marked.)
11  BY MR. SEGERBLOM:
12  Q.  Go ahead and if you want to look at Exhibit 5.
13  A.  I did.
14  Q.  So you've seen the first page of this?
15  A.  Yes.
16  Q.  All right. So Exhibit 5 is a performance
17  evaluation which you gave my client on June the 2, 2011; is
18  that correct?
19  A.  That's correct.
20  Q.  Okay. Before giving her or preparing this
21  document, did you consult with anyone?
22  A.  Yes.
23  Q.  Okay. Who did you consult with?
24  A.  Fran Juhasz. And I might have talked to Isaac
25  about it.

1    Q.    Okay.  And do you recall your conversation with
2  Ms. Juhasz, was it, what should I do now?  Or I want to give
3  her a bad evaluation?
4    A.    No.  It was I -- I told her, these are the
5  notes that I had from my evaluation.  These are the things
6  that -- I said, which ones can I use?
7          And she basically said to go ahead and write it
8  and then she would evaluate it as to what we should --
9  what -- what we should do.
10   Q.    All right.  So then looking on the first page,
11  where it lists A through G --
12   A.    Yes.
13   Q.    -- and then Satisfactory, Needs Improvement,
14  Not Satisfactory, you went ahead and checked those boxes?
15   A.    That's correct.
16   Q.    And, at that point, you had not made a decision
17  on what the evaluation was going to be?
18   A.    No.  I'm saying prior to this, I wasn't -- I
19  hadn't written this -- it -- I hadn't written this -- well,
20  I'm confused, then.  Sorry.
21   Q.    We're talking act -- let's bring back Exhibit
22  4.
23   A.    No.  I guess I'm --
24   Q.    Exhibit 4 is an oral warning and Exhibit 5 is
25  an unsatisfactory performance evaluation?

1    A.    Yes.
2    Q.    And my original question was, when you prepared
3  Exhibit 4, was it your intention to give my client an
4  unsatisfactory evaluation, which is Exhibit 5?
5    A.    No.  Not at that point, no.
6    Q.    All right.  So that's what I'm trying to do.
7    A.    I don't think so.
8    Q.    I'm trying to figure out how you arrived at
9  Exhibit 5, which is an unsatisfactory evaluation.  What
10  happened between giving Exhibit 4 and Exhibit 5, if
11  anything?
12   A.    I don't remember.  Just a second.  I think I
13  spoke -- I'm not sure, but -- I'm not sure, but I think I
14  spoke -- I reviewed everything and I spoke to Fran and
15  Isaac.
16   Q.    Okay.  And as you understood your role as a
17  principal, back in 2011, were you allowed to give a poor
18  performance evaluation on your own --
19   A.    Yes.
20   Q.    -- or were you supposed to consult with anyone?
21   A.    I -- I could give a poor performance evaluation
22  on my own.
23   Q.    All right.  But as you recall it -- well, you
24  don't recall -- you think you spoke to Ms. Juhasz --
25   A.    Oh.  I know I spoke to both of them.  I just

1  don't remember what was the guiding point that -- I don't
2  remember the specific discussions, no, but I spoke to both
3  of them, yes.
4    Q.    Okay.
5    A.    I needed guidance.
6    Q.    Okay.  And that's my question, then.  When you
7  say guidance, what kind of guidance?
8    A.    Well, I voted and I needed guidance.  I had
9  questions.  I asked questions.
10   Q.    What questions --
11   A.    I don't remember.  I'm sorry.  I don't remember
12  that.
13   Q.    That's fine.  All right.  Let me ask you.  Were
14  your questions about whether you should give her an
15  unsatisfactory or not?
16   A.    No.  It was about what I had written was
17  appropriate or not.
18   Q.    So you had already made up your mind giving her
19  unsatisfactory?
20         MS. CHU:  Objection.  Misstates testimony.
21  Come on, Dick.  Let her answer the question.
22         MR. SEGERBLOM:  I'm going to.
23         THE WITNESS:  No, it was not my intention at
24  that time.  I wrote up -- when you do an evaluation, you
25  just write it up.  Then you go to people and say what do

1  you think I should do?
2          And then, on that guidance, that's what the
3  decisions were.  Did I remember the exact questions and
4  discussions?  Absolutely, I do not.  I'm sorry.
5  BY MR. SEGERBLOM:
6    Q.    That's fine.  But --
7    A.    But --
8    Q.    -- that's what I'm trying to get to is, is it
9  your recollection that you wrote it up and then went to
10  Ms. Juhasz and Mr. Stein for guidance as to what the --
11  whether the evaluations should result in unsatisfactory or
12  satisfactory?
13   A.    I guess that came into play somewhere.  But
14  from the get-go, when I first started writing, the
15  intentions of note taking and writing the evaluation, back
16  in February, when I talked to Mr. Waldron, I had no idea
17  what I was going to write -- what I was going to mark her.
18  Does that make sense?
19   Q.    Absolutely.  I hope, in February, you wouldn't
20  know.
21   A.    Yeah.
22   Q.    I'm talking about in June, after you'd given
23  her unsat -- oral warning, at that point, it sounds like you
24  still didn't know what you were going to give her and you
25  consulted with Mr. --

Page 38

1    A.    I consulted --
2         -- Stein and Ms. Juhasz as to what the
3    evaluation should be --
4    A.    Uh-huh.
5    Q.    -- whether it was satisfactory or
6    unsatisfactory?
7    A.    Right.
8    Q.    Now, at the time you give Ms. Rodriguez this
9    evaluation, which is Exhibit 5, were you aware she had a
10   previous unsatisfactory evaluation?
11   A.    No. I never saw her folder.
12   Q.    Okay. So you were not aware that there might
13   be any consequences to her status if you gave her
14   unsatisfactory?
15   A.    No idea. I was clueless.
16   Q.    And Ms. Juhasz never told you that?
17   A.    Nope.
18   Q.    And Mr. Stein never told you that?
19   A.    No. Mr. Waldron never let me see her folder.
20   Q.    But you didn't talk to -- did you talk to
21   Mr. Waldron, too, about the unsatisfactory?
22   A.    I don't -- I don't think so.
23   Q.    Okay.
24   A.    You know, I'm not sure. I don't know. I
25   couldn't recall, but I don't think so.

Page 39

1         MR. SEGERBLOM: All right. We're done for
2    now. Did you guys have any questions?
3         MS. CHU: Not yet. Can we take a break?
4         MR. SEGERBLOM: Sure.
5         (Recess taken from 2:58 p.m. to 3:20 p.m.)
6         MS. CHU: Back on the record.
7
8              EXAMINATION
9    BY MS. CHU:
10   Q.    So, Anita, I'm going to have you look at
11   Exhibit 1.
12   A.    (Complied.) Yes.
13   Q.    Do you recall, earlier, in your deposition,
14   testifying that you were aware that Ms. Malfavon had
15   concerns about audiotaping?
16   A.    I remember -- yes.
17   Q.    Okay.
18   A.    Being asked questions, yes.
19   Q.    How did you become aware that Ms. Malfavon had
20   concerns about the audiotaping?
21   A.    Back in September -- early September, I just
22   can clarify that I just remember it was a time we put up the
23   signs for fire exit and videotaping signs right next to the
24   fire exit. She asked me if there were -- if we audiotaped
25   and I said "no."

Page 40

1    Q.    So at the time she asked you about audiotaping,
2    did she issue any complaints to you about cameras?
3    A.    She did not.
4    Q.    So looking at Exhibit 1, when you first saw the
5    memo and, specifically, paragraph 1, allegations of
6    audiotaping employees throughout the work day --
7    A.    Uh-huh.
8    Q.    -- were you aware, at the time, of who had made
9    allegations or which employees had addressed allegations of
10   audiotaping to Mr. Stein?
11   A.    No.
12   Q.    What about after your meeting with Mr. Stein?
13   A.    No.
14   Q.    If you could turn to Exhibit 3.
15   A.    (Complied.)
16   Q.    And then Bates-stamp No., within Exhibit C,
17   CCSD000336.
18   A.    (Complied.) Yes.
19   Q.    You testified, earlier, in your deposition,
20   that the page prior to 336, which is 335 --
21   A.    Uh-huh.
22   Q.    -- was part of the attachment to the e-mail
23   depicted on 336; is that correct?
24   A.    That's correct.
25   Q.    If you look at page 335.

Page 41

1    A.    (Complied.) Yes.
2    Q.    Do you see how that number 6, on the page, is
3    circled?
4    A.    Uh-huh.
5    Q.    Did you place that circle?
6    A.    No.
7    Q.    Do you know who did?
8    A.    No.
9    Q.    Turning back to page 336.
10   A.    (Complied.)
11   Q.    The last sentence in the e-mail that you wrote
12   to Fran states, "Please refer to directive item # 6." Is
13   that correct?
14   A.    Yes.
15   Q.    Why were you referring directive item No. 6 to
16   Fran, if you recall?
17   A.    Because I didn't want it to be misinterpreted
18   as retaliatory.
19   Q.    Why do you believe it would have been
20   interpreted as retaliatory?
21   A.    Because it'll -- the number 6, how it reads.
22   When, in fact, I had started documentation back in probably
23   November, December that I had. And it continued on through
24   this time period.
25   Q.    And you're talking about issues that you had

ANITA WILBUR - 10/23/2014

1  with Ms. Malfavon's duties and --
2      A.    That's correct.
3      Q.    -- responsibilities?
4      A.    That's correct.
5      Q.    Okay.  Did you give the oral warning to
6  Ms. Malfavon in retaliation for anything?
7      A.    No.
8            MS. CHU:  That's all the questions I have.
9            MR. SEGERBLOM:  All right.  I have to remember
10 what I was going to ask.
11
12                  FURTHER EXAMINATION
13 BY MR. SEGERBLOM:
14     Q.    Would you look at Exhibit 5.
15     A.    (Complied.)  Five.  Okay.  Sorry.
16     Q.    All right.  Earlier, you testified that when
17 you gave my client Exhibit 5, which is an unsatisfactory
18 evaluation, you were not aware of her previous evaluation;
19 is that correct?
20     A.    That's correct.
21     Q.    Okay.  If you look about the middle of the
22 page, the first page of Exhibit 5, it states, "Previous
23 Directions," and there's a number 1.  It says, "June 24,
24 2010 evaluation."
25     A.    Uh-huh.

1      Q.    "Focus on providing value as an
2  administrator."
3      A.    Uh-huh.
4      Q.    Okay.  Do you recall how you learned that
5  information if you weren't aware of the evaluation?
6      A.    Yeah.  Fran asked me to get a copy of her last
7  evaluation from Brad Waldron's office.  And, so, I called
8  Brad Waldron's office and I requested it and I get page 2.
9      Q.    Okay.  And do you recall when that was?
10     A.    No.  No.
11     Q.    And then you didn't question why you only got
12 page 2?
13     A.    I questioned it to Fran.  She said she'd look
14 into it.
15     Q.    All right.  And didn't --
16     A.    Never heard back.
17     Q.    Never heard back.  You believe that was during
18 this process that we described in late May and June?
19     A.    No, it was earlier.  I asked to look at her
20 folder in November and was turned down.
21     Q.    And you talked to Fran, at the time, and --
22 well, you talked to Brad and he sent page 2?
23     A.    No, I never talked to Brad.
24     Q.    Okay.  You talked to his -- who did you talk to
25 get page 2?

1      A.    Secretary.
2      Q.    Okay.  And she just sent page 2?
3      A.    Uh-huh.
4      Q.    Is that a "yes"?
5      A.    Yes.  Sorry.
6      Q.    And then you talked to Fran and Fran said she'd
7  look into it?
8      A.    I think that's how it went.  I'm not -- yeah, I
9  think so.
10     Q.    All right.  And then you never heard anything
11 further?
12     A.    Huh-uh.
13     Q.    Is that a "yes"?
14     A.    Yes.  Sorry.
15     Q.    All right.  So you don't know if Fran ever saw
16 page 1 or not?
17     A.    No, I don't.
18     Q.    Okay.
19           (Pause in the proceedings.)
20           MR. SEGERBLOM:  Oh, right.  Two other
21 questions.
22 BY MR. SEGERBLOM:
23     Q.    We've talked about cameras at AIS.  And would
24 you agree, at Gorman, you had cameras installed?
25     A.    Uh-huh.  Yes.

1      Q.    All right.  Do you know if those were paid by
2  school -- with called school-generated funds?
3      A.    I don't recall.
4      Q.    Do you know what -- you know what
5  school-generated funds are?
6      A.    That's correct.
7      Q.    Would there be some type of an invoice if they
8  weren't -- if they were paid by some fund other than
9  school-generated funds?
10     A.    I would think so, yes.
11     Q.    All right.  Now, you -- did you stay at AIS
12 until you retired?
13     A.    Yes.
14     Q.    Okay.  We've looked at a memo, I guess -- what
15 is it called -- summary of conference, dated May 19, 2011,
16 while you were at AIS Gorman.
17     A.    Which one is that?
18     Q.    That's Exhibit 2.
19     A.    Let me just find it.  Yes.
20     Q.    Okay.  Subsequent to receiving that document,
21 had you received any other disciplinary document regarding
22 your conduct at Gorman High School?
23     A.    I don't think so.
24     Q.    Okay.  So no reprimands for cameras at Gorman
25 High School?

ANITA WILBUR - 10/23/2014

Page 46

1    A.    No.
2          MR. SEGERBLOM:  Okay.  All right.  One more
3  question.
4          MS. CHU:  Okay.
5          MR. SEGERBLOM:  Or break, I mean.
6          (Recess taken from 3:29 p.m. to 3:30 p.m.)
7          MR. SEGERBLOM:  Nothing further.  She has a
8  question?
9          MS. CHU:  I'll be real quick.  Thank you.  Back
10 on record?
11
12                FURTHER EXAMINATION
13 BY MS. CHU:
14    Q.    So, Anita, you received, just now, that -- for
15 Exhibit 5, you didn't see Elena's previous --
16 Ms. Malfavon's -- I'm sorry -- Ms. Malfavon's previous
17 evaluation before issuing your own performance evaluation,
18 correct?
19    A.    That's correct.
20    Q.    And then you testified that you saw page 2?
21    A.    That's all I got.
22    Q.    Can you clarify what was on page 2.
23    A.    On page 2 was just the previous directions.
24 There were -- I think there were more than two directives
25 from what I can remember.

Page 47

1    Q.    Okay.  So there wasn't any type of performance
2  evaluation as far as --
3    A.    There's no quantifier.
4          MS. CHU:  Okay.  All done.
5          MR. SEGERBLOM:  All right.
6          (Whereupon, the deposition was concluded at
7  3:31 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 48

1              CERTIFICATE OF DEPONENT
2  PAGE   LINE   CHANGE                        REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16
                  * * * * *
17
18         I, ANITA WILBUR, deponent herein, do hereby
   certify and declare the within and foregoing transcription
   to be my deposition in said action; under penalty of
19 perjury; that I have read, corrected and do hereby affix my
   signature to said deposition.
20
21
22         _____    _____
           ANITA WILBUR, Deponent            Date
23
24
25

Page 49

1              REPORTER'S CERTIFICATE
2  STATE OF NEVADA        )
                          )  ss:
3  COUNTY OF CLARK        )
4          I, Gina DiLuzio, a duly commissioned Notary
5  Public, Clark County, State of Nevada, do hereby certify:
6  That I reported the deposition of ANITA WILBUR,
7  commencing on Thursday, October 23, 2014, at 2:01 p.m.
8          That prior to being deposed, the deponent was duly
9  sworn by me to testify to the truth.  That I thereafter
10 transcribed my said shorthand notes into typewriting and
11 that the typewritten transcript is a complete, true and
12 accurate transcription of my said shorthand notes, and a
13 request has been made to review the transcript.
14         I further certify that I am not a relative,
15 employee of counsel of any of the parties, nor a relative or
16 employee of the parties involved in said action, nor a
17 person financially interested in the action.
18         IN WITNESS WHEREOF, I have set my hand in my
19 office in the County of Clark, State of Nevada, this 6th day
20 of November, 2014.
21
22         Gina DiLuzio
23
24         GINA DILUZIO, RPR, CCR #833
25
                                              49

# EXHIBIT 23

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF NEVADA

 3                              )
    ELENA RODRIGUEZ-MALFAVON,   )
 4                              )
                  Plaintiff,    )
 5                              )
            vs.                 )   CASE NO.:
 6                              )   2:12-cv-1673-MMD-PAL
    CLARK COUNTY SCHOOL         )
 7  DISTRICT, EDWARD GOLDMAN    )
    and ANITA WILBUR,           )
 8                              )
                  Defendants.   )
 9  _____)

10

11

12

13

14          DEPOSITION OF ANITA WILBUR

15          THURSDAY, DECEMBER 4, 2014

16                 1:12 P.M.

17          AT 700 SOUTH THIRD STREET

18               LAS VEGAS, NEVADA

19

20

21

22

23

24  REPORTED BY:  MICHELLE R. FERREYRA, CCR No. 876
                  JOB NO. 228869-A
25
```

**CONDENSED TRANSCRIPT**

ANITA WILBUR - 12/04/2014

Page 2

```
1              DEPOSITION OF ANITA WILBUR,
2  taken at 700 South Third Street, Las Vegas, Nevada, on
3  THURSDAY, DECEMBER 4, 2014, at 1:12 p.m., before
4  Michelle R. Ferreyra, Certified Court Reporter, in and
5  for the State of Nevada.
6  APPEARANCES:
7  For the Plaintiff:
8       LAW OFFICES OF RICHARD SEGERBLOM
        BY:  RICHARD SEGERBLOM, ESQ.
9       700 South Third Street
        Las Vegas, NV 89101
10      (702) 388-9600
        (702) 385-2909 Fax
11      rsegerblom@lvcoxmail.com
12
   For Clark Defendants County School District, Anita
13 Wilbur and Edward Goldman:
14      LITTLER MENDELSON
        BY:  ETHAN D. THOMAS, ESQ.
15      3960 Howard Hughes Parkway
        Suite 300
16      Las Vegas, NV 89169
        (702) 862-8800
17      (702) 290-8420 Fax
        edthomas@littler.com
18
19
20
21
22
23
24
25
```

Page 3

```
1               I N D E X
2  WITNESS: ANITA WILBUR
3  EXAMINATION                              PAGE
4  Examination By Mr. Segerblom                4
5
6
7               EXHIBITS
8    EXHIBIT                                 PAGE
9    EXHIBIT 1 String of e-mails related to    4
               a process whereby the evaluation
10             was created for Ms. Rodriguez in
               June of 2011
11
     EXHIBIT 2 Attachments to e-mails in
12             Exhibit 1 string of e-mails       4
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1      LAS VEGAS, NEVADA, THURSDAY, DECEMBER 4, 2014;
2                    1:12 P.M.
3                     -oOo-
4               (Exhibits 1 and 2 marked)
5      (In an off-the-record discussion held prior to the
6  commencement of the deposition proceedings, counsel
7  agreed to waive the court reporter requirements under
8  Rule 30(b)(4) of the Nevada Rules of Civil Procedure.)
9
   Whereupon,
10
11                    ANITA WILBUR,
12 having been first duly sworn to testify to the truth,
13 the whole truth and nothing but the truth, was examined
14 and testified as follows:
15
16                    EXAMINATION
17 BY MR. SEGERBLOM:
18     Q.   Would you state your name, please.
19     A.   Anita Wilbur.
20     Q.   Ms. Wilbur, we are going to hopefully be
21 fairly brief.  I took your deposition about a month
22 ago.  In the meantime, some documents have come to my
23 attention that I wanted to just get your testimony
24 about.  And what the documents are, just for a
25 preliminary, they are e-mails related to a process
```

Page 5

```
1  whereby the evaluation was created for my client in
2  June of 2011.  And so I would like you to first look at
3  what we have mark as Exhibit 1.
4           This is just a series of e-mails back and
5  forth.  I think you're copied on virtually all of them.
6  I think you are on all of them.  And then Exhibit 2,
7  just for the record, is our attachments, which were
8  identified in the e-mail that's the first page of
9  Exhibit 1.
10     A.   Uh-huh.
11     Q.   All right.  Have you had a chance to look at
12 those at all?
13     A.   I -- I reviewed them a couple of days ago.
14     Q.   Well, I will ask you questions, but feel free
15 to take all the time you want to take with response to
16 a question.  First, do you recall why this evaluation
17 was done at this time, this time as far as around June?
18 My understanding administrative evaluations are done at
19 the end of the school year.
20     A.   That was the end of the school year.
21     Q.   Now, if you look, they all have a Bates stamp
22 number at the bottom right corner.
23     A.   Yes.
24     Q.   But they're actually a little out of sequence,
25 as far as time goes.
```

Page 6

```
1       A.   Okay.
2       Q.   But if you look at the first one we have, this
3  would be the one that's Bates stamped 2168.
4       A.   Okay.
5       Q.   This appears to be an e-mail from Fran Juhasz
6  to you dated May 31, 2011?
7       A.   Uh-huh.
8       Q.   Is that a yes?
9       A.   Yes.  I'm sorry.
10      Q.   That's all right.  We will get there.
11           Do you recall what prompted this e-mail?
12      A.   Like, what do you mean?
13      Q.   It looks like Ms. Juhasz -- well, actually, I
14  apologize.  This is actually two e-mails.  At the
15  bottom it says -- Anita Wilbur writes, Fran, I need to
16  do an eval.  And then the top part, Ms. Juhasz has
17  replied to you?
18      A.   Uh-huh.
19      Q.   All right.
20           MR. THOMAS:  Is that a yes?
21           THE WITNESS:  Yes.
22  BY MR. SEGERBLOM:
23      Q.   So you write, looking again at this Document
24  2168, you write, Fran, I need to do her eval.  I need
25  your help.  Thanks.  You don't say whose eval, so was
```

Page 7

```
1  there something beyond this e-mail that would have told
2  Fran who you were referring to?
3       A.   I probably talked to her on the phone, I
4  think.  I don't know.  I don't recall.
5       Q.   Okay.
6       A.   I don't recall.
7       Q.   All right.  Looking at the top of the e-mail
8  where it says from and then it says subject and then
9  to.  Subject it says, RE: 3 KRM.  Do you know what the
10  3 there represents?
11      A.   It was the third interchange.
12      Q.   With respect to this particular e-mail, right?
13      A.   I think so.
14      Q.   Okay.  So --
15      A.   I think -- I think that's what it means.
16      Q.   Just for the record, we don't apparently have
17  the first two, but although this particular e-mail may
18  be both the second and the third.
19      A.   I don't know.
20      Q.   Then let's look at this when you contacted
21  Ms. Juhasz and asked her for help on the evaluation for
22  Ms. Rodriguez, had you decided how you were going to
23  rate her?
24      A.   Yes.
25      Q.   Had you come to that independently?
```

Page 8

```
1       A.   Yeah.  Sort -- I had -- I had -- I had
2  conferred with -- I think Isaac Stein over the phone or
3  I'm not sure if it was over the phone or in person.
4  I'm not sure.  And with Fran.
5       Q.   So --
6       A.   Because I had a collection -- over a
7  collection of things since January.
8       Q.   Right.
9       A.   Or December, maybe.
10      Q.   Right.
11      A.   I'm not sure of the dates and times.
12      Q.   So was the decision to rate her
13  unsatisfactorily done in collaboration with Mr. Stein
14  and Ms. Juhasz?
15      A.   As I don't think her so much as Mr. Stein.
16      Q.   Okay.
17      A.   And maybe Brad Waldron.  I -- because I can't
18  remember exactly, but I know there was discussion with
19  it previous to this time.
20      Q.   Is there a reason why you contacted
21  Ms. Juhasz?
22      A.   Yes.  Because I needed help.
23      Q.   Mr. Stein or Mr. Waldron couldn't help you
24  with that?
25      A.   They told me to work with her since I had
```

Page 9

```
1  already called her a long time ago to -- to start
2  asking these kind of questions.
3       Q.   In fact, you had just worked with her to
4  prepare a summary of conference?
5       A.   Oh, yeah.  Yes.  That, too, yes.  Sorry.  I
6  forgot about that, yes.
7       Q.   Now, in Ms. Juhasz' e-mail to you, she says,
8  I'll review -- or it says, You should draft it with a
9  discipline document we sent -- I apologize.  Let's
10  start again.
11           Ms. Juhasz writes to you, Anita, you should
12  write to it with the discipline document sitting right
13  next to you.  It should be an unsat, meaning
14  unsatisfactory, with at least one of the areas
15  receiving a 1 rating.  Once it's drafted, you can send
16  it to me, along with a final copy of what you mailed to
17  her.  I'll review, I'll have legal review, and then we
18  will have Eddie do a final.  Do you know who she is
19  referring to when she says Eddie?
20      A.   Oh, Dr. Goldman.
21      Q.   Do you know why Dr. Goldman was included?
22      A.   No clue.
23      Q.   Apparently the next e-mail is 2165?
24      A.   Okay.
25      Q.   This is an e-mail -- I'm sorry, 2166.  And
```

1 this is an e-mail from you to Ms. Juhasz, and
2 apparently you attached your draft of the evaluation?
3     A.  I think there are drafts.  I'm not sure -- I'm
4 not sure.  I'm not sure what they are exactly.  I
5 assume they are drafts.
6     Q.  Then if you look at the next page, 2167 --
7     A.  Uh-huh.  Oh, there it is.  Okay.  Yeah, yeah,
8 yeah.  Sorry.
9     Q.  So now is this another e-mail that you wrote?
10     A.  Yes.
11     Q.  Now, I would like you to also look at
12 Exhibit 2 because I want you to just verify something.
13 If you look at 2167, at the very top it says, This doc
14 is my typed version of your handwritten eval.  And then
15 if you look over on Exhibit 2, Bates stamped 2256 --
16     A.  2256?  Okay.
17     Q.  Can you determine whether that is the document
18 you were referring to, which was your typed version of
19 Ms. Juhasz' handwritten evaluation?
20     A.  I can't confirm that that's what it is.
21 I -- I can't -- I mean, I don't know.
22     Q.  All right.
23     A.  It's one of these.
24     Q.  Okay.
25     A.  Sorry.

1     Q.  It's all right.
2     A.  That's all I know.
3     Q.  That's all you can do.
4     A.  I can't tell you which one is which one
5 anymore.
6     Q.  That's fine.
7         Do you recall how you received her handwritten
8 evaluation?
9     A.  Whose handwritten evaluation?
10     Q.  Well, apparently based on your e-mail, Fran
11 Juhasz had sent you a handwritten evaluation that you
12 retyped?
13     A.  No.
14     Q.  Okay.
15     A.  I don't think so.  Am I confused?  I -- I
16 wrote the evaluation.  Is that what you are asking me?
17     Q.  Well, look at the first --
18     A.  I'm confused.
19     Q.  On 2167 --
20     A.  Yeah.
21     Q.  -- at the top it says, 060111 ERM eval,
22 revised word.  Then underneath it says, This doc is my
23 typed version of your handwritten eval; correct?
24     A.  Yes.
25     Q.  So I assume, based on your statement, that you

1 had typed something that Ms. Juhasz had given you in
2 handwritten form?
3     A.  Just the template.
4     Q.  Then let's go ahead and look at 2267, which is
5 part of Exhibit 2 in your left hand.
6     A.  What number?
7     Q.  2267.
8         MR. THOMAS:  It's back on Exhibit 1.
9         THE WITNESS:  Oh, okay.  I go the left hand.
10 It was in my left hand.
11 BY MR. SEGERBLOM:
12     Q.  2257.  I'm sorry.
13     A.  Oh, 2257.  Okay.
14     Q.  I apologize for being so confusing.  Now this
15 is a document with handwriting on it.  Is this, to your
16 knowledge, your handwriting, Fran's handwriting?
17     A.  This is my handwriting.
18     Q.  Then turn to the next page, which is 2258?
19     A.  That's my handwriting.
20     Q.  That's your handwriting.  So those are not the
21 documents that you are referring to in Bates stamp 2167
22 when you are talking about her handwritten, her being
23 Fran Juhasz' handwritten evaluation?
24     A.  I don't -- I don't know.  I don't know.
25     Q.  All right.  That's fine.  Now, is it your

1 understanding that Dr. Goldman had to approve the
2 evaluation of Ms. Rodriguez?
3     A.  I didn't have an understanding of that.
4     Q.  So if you look at the first page of Exhibit 1,
5 which is Bates stamped 2163, if you read the top, it
6 says, Anita, the documents are approved for Dr. Goldman
7 for issuing.
8     A.  At that point in time, I -- I realized he was
9 involved.  But before that, I was doing what I was
10 doing.
11     Q.  That's fine.  But it was your understanding
12 that he had approved what was being done?
13     A.  Probably, yes.  At this point in time, yes.
14     Q.  I think you testified in the previous
15 deposition, you were not aware if this was the first
16 negative evaluation or the second negative evaluation?
17     A.  And I had was page 2 of her evaluation.
18     Q.  All right.  And --
19     A.  Never seen the folder.
20     Q.  And you were not aware if any consequences
21 would flow from a negative evaluation?
22     A.  (Witness shakes head.)
23     Q.  Is that a no?
24     A.  I'm sorry, no.
25     Q.  All right.  But you were aware that she had

ANITA WILBUR - 12/04/2014

Page 14

```
 1   been RIF'd at this point?
 2      A.   No, I don't believe so.
 3           MR. SEGERBLOM:  All right.  Did you have any
 4   questions?
 5           MR. THOMAS:  I don't think so.
 6           MR. SEGERBLOM:  Let me just talk to her real
 7   quick.
 8               (Off the record.)
 9           MR. SEGERBLOM:  All right.  No further
10   questions.
11           MR. THOMAS:  You are done.
12               (Thereupon, the deposition concluded at
13               1:28 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 16

```
 1                 CERTIFICATE OF REPORTER
 2   STATE OF NEVADA   )
     COUNTY OF CLARK   )
 3        I, Michelle R. Ferreyra-Marez, a Certified Court
 4   Reporter licensed by the State of Nevada, do hereby
 5   certify:  That I reported the deposition of ANITA
 6   WILBUR, commencing on THURSDAY, DECEMBER 4, 2014, at
 7   1:12 p.m.
 8        That prior to being deposed, the witness was
 9   duly sworn by me to testify to the truth.  That I
10   thereafter transcribed my said stenographic notes into
11   written form, and that the typewritten transcript is a
12   complete, true and accurate transcription of my said
13   stenographic notes, and that a request has been made to
14   review the transcript.
15        I further certify that I am not a relative,
16   employee or independent contractor of counsel or of any
17   of the parties involved in the proceeding, nor a person
18   financially interested in the proceeding, nor do I have
19   any other relationship that may reasonably cause my
20   impartiality to be questioned.
21        IN WITNESS WHEREOF, I have set my hand in my
22   office in the County of Clark, State of Nevada, this
23   17th day of December 2014.
24
25                 MICHELLE R. FERREYRA, CCR No. 876
```

Page 15

```
 1                 CERTIFICATE OF DEPONENT
 2   PAGE   LINE    CHANGE         REASON
 3
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13               * * * * *
14
15   I, ANITA WILBUR, deponent herein, do hereby certify and
16   declare under the penalty of perjury the within and
17   foregoing transcription to be my deposition in said
18   action; that I have read, corrected and do hereby affix
19   my signature to said deposition.
20
21
22        _____
23                 ANITA WILBUR, Deponent
24
25
```

# EXHIBIT 24

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

**CONDENSED TRANSCRIPT**

ELENA RODRIGUEZ-MALFAVON,        ) Case No.
                                 )
                                 ) 2:12-CV-
            Plaintiff,           ) 01673-APG-
                                 ) PAL
      vs.                        )
                                 )
                                 )
CLARK COUNTY SCHOOL DISTRICT, EDWARD )
GOLDMAN and ANITA WILBUR,        )
                                 )
                                 )
            Defendants.          )
                                 )

DEPOSITION OF EDWARD GOLDMAN

Las Vegas, Nevada

Friday, October 24, 2014

REPORTED BY:  Tammy M. Breed, CCR NO. 305

JOB NO.:  224077

EDWARD GOLDMAN - 10/24/2014

**Page 2**

1    DEPOSITION OF EDWARD GOLDMAN, taken at 700 South
2  Third Street, Las Vegas, Nevada, on Friday, October 24,
3  2014, at 1:06 p.m., before Tammy M. Breed, Certified
4  Court Reporter, in and for the State of Nevada.
5
6  APPEARANCES:
7  For the Plaintiff:
8        RICHARD SEGERBLOM, ESQ.
         700 South Third Street
9        Las Vegas, Nevada 89101
         (702) 388-9600
10       rsegerblom@lvcoxmail.com
11
12  For the Defendants:
13       PATRICK H. HICKS, ESQ.
         Littler Mendelson, P.C.
14       3960 Howard Hughes Parkway
         Suite 300
15       Las Vegas, Nevada 89169-5937
         (702) 862-7700
16       phicks@littler.com
17
18  Also Present:
19       Elena Rodriguez-Malfavon
20
21
22
23
24
25

**Page 3**

1                        I N D E X
2  WITNESS:  EDWARD GOLDMAN
3  EXAMINATION
4                                           PAGE
5    BY:  Mr. Segerblom                     6, 34
6    BY:  Mr. Hicks                         30
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1                    EDWARD GOLDMAN
2    ELENA RODRIGUEZ-MALFAVON vs. CLARK COUNTY SCHOOL
                        DISTRICT
3
4              Friday, October 24, 2014
5            Tammy M. Breed, CCR No. 305
6              E  X  H  I  B  I  T  S
7  EXHIBIT                                  PAGE
8  Exhibit 1   Memo from Isaac Stein to Anita   9
               Wilbur, Dated 4/28/11, 1 page
9  Exhibit 2   CCSD Record of Personnel         11
               Notification of Employee Anita
10             Wilbur, Dated 5/19/11, 1 page
11 Exhibit 3   Copies of e-mails, Bates CCSD    12
               309 to 339
12
13 Exhibit 4   CCSD Record of Personnel         13
               Notification of Employee Elena
14             Rodriguez-Malfavon, Dated
15             5/26/11, 2 pages
   Exhibit 5   CCSD Performance Evaluation      18
16             Report - Central Office
               Administrator of Employee Elena
17             Rodriguez-Malfavon, Dated
18             6/2/11, 2 pages
   Exhibit 6   Negotiated Agreement between the 22
19             CCSD and the Clark County
               Association of School
20             Administrators and
               Professional-technical Employees
21             2009-2011, Pages 43 to 46
22 Exhibit 7   Negotiated Agreement between the 22
               CCSD and the Clark County
23             Association of School
               Administrators and
24             Professional-technical Employees
25             2011-2013, Pages 42-49

**Page 5**

1  Exhibit 8   Defendant Edward Goldman's       25
               Responses to Plaintiff's First
2              Set of Interrogatories
3
   Exhibit 9   Defendant Clark County School    26
4              District's Responses to
               Plaintiff's Second Set of
5              Interrogatories
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

EDWARD GOLDMAN - 10/24/2014

Page 6

```
1          Las Vegas, Nevada; Friday, October 24, 2014
2                      1:06 p.m.
3                       -oOo-
4   Whereupon --
5                  EDWARD GOLDMAN
6   having been first duly sworn to testify to the truth,
7   was examined and testified as follows:
8
9                   EXAMINATION
10  BY MR. SEGERBLOM:
11     Q.  State your name, please.
12     A.  Edward Goldman, G-O-L-D-M-A-N.
13     Q.  Mr. Goldman, as far as I understand, you work for
14  the Clark County School District?
15     A.  Yes.
16     Q.  And you've worked there since about 1980?
17     A.  One.
18     Q.  '81, okay.
19            What is your current position?
20     A.  I'm the associate superintendent for employee
21  management relations.
22     Q.  All right.  Did you previously have a title,
23  something to do with negotiations?
24     A.  There was never a title specifying negotiations.
25  My former title was the assistant superintendent for
```

Page 7

```
1   administrative operations.
2      Q.  But was there a time when you were appointed to
3   be in charge of any of the negotiations?
4      A.  Yes.
5      Q.  And when was that, if you recall?
6      A.  The first time in 1989.
7      Q.  I guess shouldn't have asked that question.
8   When's the last time, let's put it that way?
9      A.  July of 19 -- 2011.
10     Q.  Is that currently part of your current job or is
11  it?
12     A.  Yes.
13     Q.  When you received the appointment to be in charge
14  of negotiations, did you replace somebody?  Was there an
15  acting person or?
16     A.  The chief negotiator was Fran Juhasz.
17     Q.  All right.  You're aware of my client, Ms.
18  Rodriguez?
19     A.  Yes.
20     Q.  Okay.  Do you recall when she transferred into
21  your division back in 2010?
22     A.  I don't recall the exact year or time; but yeah,
23  I recall when she was reassigned there, yes.
24     Q.  And she went from the purchasing department to
25  the AI -- AIBS or --
```

Page 8

```
1      A.  ESD
2      Q.  Okay, ESD.  But she actually went to the school
3   AIS (sic)?
4      A.  That was -- that was her assignment within the
5   division, yes.
6      Q.  All right.  And the division was ESD?
7      A.  Yes.
8      Q.  That's -- you were in charge of that?
9      A.  Yes.
10     Q.  So was that an associate superintendent or
11  assistant superintendent?
12     A.  Associate superintendent, Educational Services
13  Division.
14     Q.  Did you -- were you actively involved in her
15  transfer, or was that done by somebody else?
16     A.  That was done by the superintendent.
17     Q.  Did he consult with you?
18     A.  She did not consult with me, the former supervisor
19  of that -- I don't remember exact -- if she was director
20  of purchasing did.
21     Q.  Bramby Tollen?
22     A.  Correct.
23     Q.  All right.  Do you recall if you knew that my
24  client had received an unsatisfactory evaluation before
25  she transferred?
```

Page 9

```
1      A.  I don't recall that discussion -- in the
2   discussion she stated that she received an
3   unsatisfactory evaluation.  It didn't come up.  She just
4   said that she was trouble.
5      Q.  She was trouble?
6      A.  Yes.
7      Q.  Okay.  Bramby's kind of trouble too, but I guess
8   that's another matter I guess.
9            I'm going to show you what we'll mark as
10  Exhibit 1.
11  (Exhibit No. 1 marked.)
12          MR. SEGERBLOM:  And for the record this is a
13  memo dated Thursday, April 28, 2011.
14     Q.  (BY MR. SEGERBLOM)  Your name doesn't appear on
15  here, so I don't know if you ever seen it before or not?
16     A.  I don't recall that I did.
17     Q.  Okay.  All right.  This is a memo from Isaac
18  Stein to Anita Wilbur.  Did you -- in April of 2011, did
19  you know Mr. Stein?
20     A.  No.
21     Q.  Okay.  And what was his position?
22     A.  He was one of the directors in a division
23  assigned to the east area schools within the division.
24     Q.  And did he report to you?
25     A.  No.
```

EDWARD GOLDMAN - 10/24/2014

**Page 10**

1     Q. Who did he report to you?

2     A. Brad Waldron.

3     Q. Okay. What was Mr. Waldron's position?

4     A. Mr. Waldron was the executive director of the

5 education services division.

6     Q. And how Anita Wilbur, do you recall what her

7 position was?

8     A. She was the principal of the academy for

9 individualized study.

10     Q. Would Mr. Stein have been her supervisor?

11     A. Yes.

12     Q. Now, you said you didn't recognize the document,

13 but do you recall sometime in spring of 2011 that

14 Mr. Stein was investigating issues about audio taping by

15 Ms. Wilbur?

16     A. Yes.

17     Q. When did you first learn about that?

18     A. I don't know.

19     Q. What do you recall knowing about it?

20     A. Just that he mentioned to me that they were

21 concerns or complaints, I can't remember the exact

22 words, regarding Mrs. Wilbur audio and/or visual taping

23 that was occurring in her office or at the school.

24     Q. Did he mention anyone who was complaining?

25     A. I don't recall that he mentioned any names

**Page 11**

1 but. . .

2     Q. Okay. All right. I'll show you what's marked as

3 Exhibit 2.

4     (Exhibit No. 2 marked.)

5     Q. (BY MR. SEGERBLOM) I apologize, but this is the

6 only copy we have. Obviously the signatures are

7 illegible, but I will represent to you that this is a

8 Summary of Conference that was given to Ms. Wilbur, May

9 19th, 2011. And in her deposition she testified that

10 she had signed for this and that it was given to her by

11 Mr. Stein.

12     Do you recall Mr. Stein giving Ms. Wilbur a

13 Summary of Conference about the audio taping and other

14 issues that spring?

15     A. I don't recall that he did or didn't.

16     Q. Okay. Is this something that in the normal

17 course he would be required to tell you about?

18     A. He wouldn't be required since it's not a

19 disciplinary document, but he may have. He probably

20 told me about it, but I don't recall that he did or did

21 not.

22     Q. Okay. Is -- in your -- when you were in charge

23 of ESD, were you -- did -- was it a requirement that any

24 time an employee was disciplined, they had to notify

25 you, somebody had to notify you?

**Page 12**

1     A. It would depend on the nature of it; but yeah, I

2 would expect if they were disciplining and certainly an

3 administrator they would tell me about it.

4     Q. Okay. I'm going to show you what's marked as

5 Exhibit 3.

6     (Exhibit No. 3 marked.)

7     Q. (BY MR. SEGERBLOM) Even though it's a 30-page

8 document, we'll only be talking about a couple of pages,

9 but if you want to look at the whole thing.

10     A. It's probably easier if you just ask me

11 questions. If I need the document, I'll look at it.

12     Q. All right. I'll just represent to you that this

13 is basically a series of e-mails from I think May 20th

14 to May 27th that relate to an oral warning which was

15 given to my client. And the e-mails are primarily

16 between Ms. Wilbur and Fran Juhasz, but in a couple of

17 places there's a reference to you and then there's also

18 what appears to be maybe even a response, an e-mail from

19 you as part of the train -- chain of command -- chain,

20 not chain of command, part of the e-mail chain.

21     Do you recall, sitting here today, an e-mail

22 interaction with Ms. Juhasz and Ms. Wilbur regarding my

23 client back in May of 2011?

24     A. No.

25     Q. All right. This -- and actually I'll tell you

**Page 13**

1 what, we'll give you another document just so you can

2 reference it. This is Exhibit 4.

3     (Exhibit No. 4 marked.)

4     Q. (BY MR. SEGERBLOM) I'll represent to you that

5 Exhibit 4 is the oral warning which resulted from the

6 e-mails which are Exhibit 3.

7     A. Okay.

8     Q. All right. Does that refresh your memory as far

9 as an oral warning that was given to my client back in

10 June -- or May of 2011?

11     A. No, but the document speaks for itself.

12     Q. All right, all right.

13     Then, if you would, looking at the larger

14 document, which is Exhibit 3, turn to the Bates stamp

15 from 309 to 339, if you'll turn to the one that is Bates

16 stamped 316. It's in the bottom right corner.

17     A. Okay.

18     (Pause in the proceedings.)

19     Q. (BY MR. SEGERBLOM) All right. So on the

20 document Bates stamped 316, there's an e-mail from Ms.

21 Juhasz to Ms. Wilbur. And in that e-mail Ms. Juhasz

22 says that she's working with Dr. Goldman on this. (As

23 read): Per Dr. Goldman, please do not do anything

24 further until I hear back from him.

25     Again, as you sit here today, you don't have any

EDWARD GOLDMAN - 10/24/2014

Page 14

1  recollection of?
2      A.  I don't recall all the specifics here.  By the
3  way, this document's from Anita to Fran, not the other
4  way around, at least as far as the caption appears
5  there.
6      Q.  Right.
7      A.  Yes.
8      Q.  Would it be customary for you to work with Ms.
9  Juhasz in developing an oral warning for an
10  administrator in your division?
11     A.  No, not working with Ms. Juhasz.  She -- that was
12  her job, and Ms. Wilbur would have been referred to her
13  to work with her on making sure the document was
14  correctly written, the right things said, what needed to
15  be included, not included, that type of stuff.  And so
16  that's who was working with her, uh, in EMR with --
17  that's who was working with Ms. Wilbur in EMR was Fran
18  Juhasz.  But they certainly would have kept me apprised
19  of anything that was out of the ordinary or something
20  that was serious or whatever.  It would not be uncommon
21  for them to keep me informed about it.  But I can't tell
22  you today what, if anything, I was specifically advised
23  of.
24     Q.  So it's your belief that this would have been out
25  of the ordinary, whatever was going on, but you can't

Page 15

1  recall why it was out of the ordinary?
2      A.  No --
3          MR. HICKS:  Objection, misstates the
4  testimony.
5          THE WITNESS:  -- that's not what I -- that's
6  not what I said.  I said they would have kept me advised
7  in normal course of events, but I can't tell you I
8  specifically recall that -- what -- in this case they
9  would have apprised -- specifically they would apprise
10  me of it.  They would have apprised me of discipline
11  related to an administrator.
12     Q.  (BY MR. SEGERBLOM)  All right.  So that was my
13  question.  So is it your testimony that any discipline
14  that was given to an administrator here in division, you
15  would have been involved in -- at least been apprised of
16  by Ms. Juhasz and the principal?
17     A.  Well, Ms. Juhasz was not always involved, so
18  whoever was involved would have.  Except if it was
19  Mr. Waldron he knew what he needed -- what he needed to
20  do, what needed to be done he probably would just tell
21  me what occurred.  Ms. Juhasz knew what needed to be
22  done.  Those things she felt that I should have been
23  told about, she would have at that stage.
24          And Ms. Wilbur was not that familiar with writing
25  disciplinary documents, so she would -- she may -- would

Page 16

1  have called me if Mr. Waldron or Mr. Stein told her that
2  she should talk to me or something like that, or she
3  just may have called me.  In which case, I probably
4  would have referred her to Ms. Juhasz if it was how to
5  write one correctly.
6      Q.  All right.  If you will turn to the document
7  Bates stamped 336, which is toward the end?
8      A.  (Witness complying.)
9      Q.  All right.  This is an e-mail from Ms. Wilbur to
10 Ms. Juhasz dated May 20th.  And in the body of the
11 e-mail she -- Ms. Wilbur states, (as read):  I also need
12 you to be aware of what I received yesterday.  Please
13 refer to directive item #6.
14          And if you'll turn one page back to 335, you'll
15 see that she's referring to the Summary of Conference
16 that she had received on the day before, May 19th, and
17 specifically Item 6 which says, (as read):  Do not
18 discuss these allegations with employees or take any
19 retaliatory action against any employee.
20          When you were involved in this process of giving
21 the oral warning to my client, were you aware that --
22 that Ms. Wilbur had just received her own Summary of
23 Conference and then had been ordered not to retaliate
24 against anybody?
25     A.  I'm sure I would have known at the time that

Page 17

1  Mrs. Wilbur received a disciplinary document, but No. 6
2  was pretty much routine in any cases that -- that I
3  recall and certainly if that was Mr. Stein's practice to
4  make sure that that line was included.  It's included in
5  many documents as a kind of routine matter to the -- to
6  the person receiving the document, if that person
7  supervises other people or if the document is as a
8  result of people, employees complaining or something,
9  that's a -- that is very often for just a routine
10 direction.
11     Q.  All right.  But specifically on 336 --
12     A.  Yes.
13     Q.  -- Ms. Wilbur was actually -- pointed out that
14 that might be an item of concern with respect to the
15 discipline given to Ms. Rodriguez.  Do you recall ever
16 being concerned that there might be a link between the
17 discipline of Ms. Wilbur and then the discipline of
18 Ms. Rodriguez?
19          MR. HICKS:  Can you read that question back,
20 please?
21 (The requested portion of the
22 record was read by the reporter.)
23          MR. HICKS:  Objection, vague.
24     Q.  (BY MR. SEGERBLOM)  You're allowed to answer.
25     A.  Okay.  I would tell you, not in cases I dealt

EDWARD GOLDMAN - 10/24/2014

Page 18

1  with because I knew I would have known what Ms. Wilbur
2  was being disciplined for and what she did or did not do
3  and what Mrs. Rodriguez was being disciplined for. And
4  if it was not legitimate, then in either -- either side,
5  meaning Mrs. Wilbur or Mrs. Rodriguez, it probably would
6  not have happened. So no, absolutely not that it was
7  retaliatory.
8  Q. All right. But as you sit here today, you don't
9  recall questioning anyone to make sure that there was no
10 correlation between the two?
11 A. I don't recall that I did. I believe either of
12 the two administers in between would have told me.
13 Q. All right. I am going to show you what is marked
14 as Exhibit 5.
15 (Exhibit No. 5 marked.)
16 (Telephone interruption.)
17          THE WITNESS: I apologize, this is my
18 doctor.
19 (Pause in the proceedings.)
20 Q. (BY MR. SEGERBLOM) Actually, if you still have 4
21 there.
22 A. Yes.
23 Q. All right. You have in front of you --
24 A. Yes.
25 Q. -- Exhibits 4 and 5.

Page 19

1          Exhibit 4 is an oral warning that was given to my
2  client on May 26th, and Exhibit 5 is an unsatisfactory
3  evaluation, which was given to her on June the -- well,
4  actually it's dated June the 2nd, 2011.
5  A. Okay.
6  Q. When you were -- well, do you recall if my client
7  received a negative -- unsatisfactory evaluation in June
8  of 2011?
9  A. I recall that she did, yes.
10 Q. All right. And were you aware at the time that
11 she had been proposed for a reduction in force?
12 A. I don't recall the timing of when these -- these
13 things took place. The reduction in force was as a
14 result of a cut in positions that the superintendent
15 decreed for every division. I don't recall the timing
16 of what happened, first or second, or whether even
17 elimination of positions would necessarily result in a
18 reduction of force.
19 Q. Do you recall selecting her for a reduction in
20 force?
21 A. I recall making the decision as to which
22 positions -- that was direct -- to eliminate in the
23 division.
24 Q. And -- but do you recall specifically picking her
25 position to be eliminated?

Page 20

1  A. Yes.
2  Q. All right. And this evaluation was her second
3  unsatisfactory evaluation. Do you recall if that had
4  any particular significance to the fact that she --
5  there was a reduction in force going on?
6  A. No, absolutely not.
7  Q. Okay. So as far as you knew, just because you
8  had two negative evaluations, the reduction of force
9  would take place the same way?
10 A. If there was a reduction in force.
11 Q. But like you testified that she had been
12 reduced -- there was a reduction in force?
13 A. Ultimately there was. But just making an
14 unsatisfactory did not mandate that there be a reduction
15 in force.
16 Q. Right.
17 A. If there was a reduction in force, then there was
18 a question of who got reduced first, but it was not --
19 elimination of positions does not necessarily mean there
20 would be one.
21 Q. All right. Just so to break that out. So
22 initially her position was reduced in force, but that
23 did not mean that she would be -- she would still have a
24 job, right, she could bump?
25 A. That's not an accurate description. Her

Page 21

1  position, along with another one, was eliminated, so
2  there's no more position. What happens to the
3  individual in that position depends on whether in the
4  district as a whole it would result in positions
5  being -- I'm sorry, people being reduced in force as a
6  result of elimination of positions.
7  Q. Right. But if her position was eliminated
8  through a RIF, did she have bumping rights?
9  A. You're misstating.
10 Q. Okay.
11 A. You're misstating the process. So if her
12 position was eliminated, and there was no other position
13 that she could go into at her level -- she was
14 non-licensed so -- met the job requirements or whatever,
15 based on seniority, then it could result in a
16 district-wide reduction in force. In which case she
17 would subject to a reduction in force, which she was.
18 Q. All right. But you said seniority, so are you
19 saying that if she was senior to somebody else at her
20 level that even though her position was RIF'd, she would
21 have a right to bump that person?
22 A. No, because that was the year that the
23 legislature, you would know, mandated that the parties
24 negotiate a procedure that could not be -- a procedure
25 for reduction in force that could not be solely based on

EDWARD GOLDMAN - 10/24/2014

**Page 22**

1  seniority, and that was in effect that year.
2    Q. All right. So were you -- you said you were
3  aware that she received the negative evaluation?
4    A. Yes.
5    Q. Okay. But as you sit here today, you don't
6  recall if that had any consequence to her as far as
7  whether she would be RIF'd or not?
8    A. At the time I don't -- at the time that it was
9  issued I don't recall, because I -- I don't recall that
10  we knew or we were told what would -- that there would
11  be a reduction in force, how many, and so forth. We
12  could have been, I just don't recall that --
13    Q. Okay.
14    A. -- at that time.
15    Q. Do you recall in 2011 a change in the reduction
16  of force process between the old contact and the new
17  contract which was negotiated?
18    A. Yes.
19    Q. Okay. I'm going to show you what we'll mark as
20  Exhibit 6 and 7.
21  (Exhibit Nos. 6 & 7 marked.)
22        MR. HICKS:  Is Exhibit 6 the old one and --
23        MR. SEGERBLOM:  Yeah, Exhibit 6 is the -- on
24  the front it says "2009-2011."
25        MR. HICKS:  Thank you.

**Page 23**

1        MR. SEGERBLOM:  And Exhibit 7 says on the
2  front "2011-2013."
3        And what I've done is I've moved right to
4  Article 26, which is the section which deals with
5  reduction in force.
6        MR. HICKS:  Okay.
7    Q. (BY MR. SEGERBLOM)  You may know this just
8  because of your position, but can you tell me how --
9  what the change was between the 2009-2011 contract and
10  the 2011-2013 contract with respect to reduction in
11  force under 26-2?
12    A. Yes, I think I'm pretty much familiar with it so
13  I may -- hope I can do this without having to read every
14  word.  The change -- the changes were of course the
15  people who volunteered were the first to go, but then it
16  was people who had been -- the next group or person to
17  go was not seniority, but rather the person who had been
18  twice rated as unsatisfactory within the last two years
19  would be the next to be reduced in force.
20        And if there was further reductions in force then
21  it would be -- cannot be made by that one, it would be,
22  (as read):  (2) successive contract years which resulted
23  in a suspension of five days.  Then we were going to
24  suspicions.  All those before seniority came into play.
25    Q. But the question is, what was the change.  And if

**Page 24**

1  you look at Article 26-2 in the Exhibit 7, which is
2  2011-2013 contract, there's a section -- or a sentence
3  added which says, (as read): "An administrator who is
4  reduced in force under the provisions of 26-2-2 will not
5  be recalled to an administrative position?
6    A. Correct, that was another change that was made,
7  yes.
8    Q. Okay. So that's what I was asking is can you
9  explain --
10    A. I apologize.
11    Q. -- what that meant as far as could not be
12  recalled?
13    A. Well, I would say there was no right to recall.
14  Under the previous contract if you were -- if you were
15  reduced in force and ended up in a different lower
16  position, different bargaining unit, if a position
17  opened up, as I recall, within two years of the time
18  that the reduction in force occurred, you -- the
19  employee had a right to return to his or her former
20  position.
21        And after this contract was in place then there
22  was no more rights to return to your former position if
23  the reduction in force was as a result of unsatisfactory
24  evaluations.
25    Q. All right. So as I understand it, if you -- if

**Page 25**

1  you were reduced in force because you had two
2  unsatisfactory evaluations, under the old contract you
3  could be recalled to administrative position, but under
4  the new contract you were demoted to a -- a non-super --
5  non-administrative position and you couldn't go back to
6  an administrative position?
7    A. Correct.
8    Q. Now, do you know when that change took place
9  between the old contract and the new contract?
10        MR. HICKS:  Are you asking when it was
11  negotiated, when it was applied, when it was adopted?
12    Q. (BY MR. SEGERBLOM)  When it became effective?
13    A. It became effective -- it became effective when
14  the -- July 1.  Everything was retroactive July 1 of
15  that year subsequent to ratification.  So the -- if the
16  contract was agreed -- I don't recall the dates, but if
17  the contract was agreed to prior to July 1 of that year,
18  it would have been effective July 1.  If it was
19  finalized after July 1, it would have been retroactive
20  to July 1.
21    Q. All right. Show you what's marked as Exhibit 8.
22  (Exhibit No. 8 marked.)
23    Q. (BY MR. SEGERBLOM)  And I'll represent that this
24  is your Responses to Interrogatories, which were
25  propounded in this case.  And I'd like you to

EDWARD GOLDMAN - 10/24/2014

Page 26

1 specifically look at question number -- Interrogatory
2 No. 2, which is on page 3.
3     A.  (Witness complying.)  Okay.
4     Q.  I don't know if you want to read it, but I just
5 want to verify --
6     A.  I think I recall it.
7     Q.  Okay.  If you could just make sure that this is
8 in fact an accurate answer.  The question was, did you
9 recommend Ms. Rodriguez's position be eliminated in the
10 2011-2012 RIF.  And your answer indicates that -- that
11 in fact you did and that that was -- that decision
12 was -- that recommendation was made prior to May 2nd of
13 2011?
14     A.  Yes.
15     Q.  Okay.  I'll show you what is marked as Exhibit 9.
16 (Exhibit No. 9 marked.)
17         MR. HICKS:  Do you have a 9 for me?
18         MR. SEGERBLOM:  I'm sorry, yes, I do.
19     Q.  (BY MR. SEGERBLOM)  Again, I would like you to
20 look at -- these are answers to interrogatories by the
21 Clark County School District.  And on page 3,
22 Interrogatory No. 2, asks about the amendment to Article
23 26, which we just talked about.
24     A.  Okay.
25     Q.  All right.  And is that answer accurate to the

Page 27

1 best of your knowledge?
2     A.  Yes, to the best of my knowledge it is accurate.
3     Q.  Now, we just talked about a change between the
4 two contracts where before an administrator who had two
5 negative evaluations and was demoted had a right to go
6 back to an administrative position, and under the new
7 contract that right was taken away and once you were
8 demoted you stayed demoted?
9     A.  Correct.
10     Q.  Do you recall when you actually learned of that
11 difference in the new contract?
12     A.  When did I learn of it?
13     Q.  Yes.  Well, I guess the first question is:  Were
14 you involved in negotiating that change?
15     A.  Absolutely not, not one word of it.
16     Q.  Okay.  So when do you think you learned about it?
17     A.  Probably when I was made the chief negotiator
18 in sometime June or July of 2011.  We would review
19 the -- review everything that had been agreed to already
20 by -- the parties' negotiations I believe started in
21 February or before.  I don't know, I wasn't involved.
22 But obviously we would review everything that had been
23 agreed to by the board and the association, in this case
24 the Association of School Administrators.  And so
25 somewhere -- sometime in there -- sometime during that

Page 28

1 time period I would have reviewed what had already been
2 agreed to by the parties and where we were and get the
3 superintendent's direction as to what, if anything, else
4 you would like to have us propose or discuss the table
5 or not.
6     Q.  Okay.  And I think you previously said that
7 Ms. Juhasz had been in those negotiations before you
8 took them over?
9     A.  Yeah, she was the chief negotiator up to the time
10 that I took over.
11     Q.  So apparently she would know about those -- that
12 proposed change in the contract before you were
13 involved?
14     A.  Yes, I would assume so.  She was the negotiator,
15 I -- I was not, and it was already in place, in other
16 words agreed to, before I took the job over.
17     Q.  All right.  But as you sit here today, you don't
18 have any recollection of you -- Ms. Juhasz advising you
19 that if my client received a second bad evaluation that
20 under the new contract that was proposed, she would be
21 demoted and wouldn't have a chance to -- to go back to
22 administrative position?
23     A.  I don't know that she did or did not or would
24 have to.  I can read what was agreed to, you know, from
25 the association and what was proposed by the

Page 29

1 association.  So it was pretty clear that that would
2 happen, so I don't know that she would have to advise me
3 of it or whether we even discussed it or not, but we
4 could have.
5     Q.  Okay.  But you're not -- I thought you testified
6 that you were not aware that when my client received the
7 second bad evaluation that she would lose her right to
8 be an administrator?
9     A.  I believe what I said was that it was not nec --
10 it was not automatic that if the position was eliminated
11 she would actually lose her job.  That would depend on
12 what positions remained when the elimination of
13 positions occurred.
14     Q.  But under the contract if you get two negative
15 evaluations, you do lose your position, right?
16     A.  If there's a reduction in force.
17     Q.  You knew there was a reduction in force going on?
18     A.  At some point.  I just testified I don't recall
19 when I knew that there would be a reduction in force
20 because, uh, first all the eliminated positions would
21 be -- would go to human resources and they would go
22 through and see if there are any positions left to place
23 people or we -- a reduction in force would be -- would
24 take place, and that was done in conjunction with human
25 resource and the administrative union.  But at some

**Page 30**

1  point, yes, I knew that she would end up being reduced
2  in force.
3          MR. SEGERBLOM:  All right.  I need to talk
4  to my client.  Do you have any questions?
5          MR. HICKS:  No.  You done?
6          MR. SEGERBLOM:  Yes.  So I -- let me talk to
7  Elena.
8          MR. HICKS:  I'll step out.
9  (A brief recess was taken.)
10          CROSS-EXAMINATION
11  BY MR. HICKS:
12      Q.  Dr. Goldman, I have a couple follow-up questions.
13  Let me first ask you about the process of the
14  negotiations as it related to the negotiated agreement
15  between the school district and the Clark County
16  Association.
17          With regard to Article 26, what's your
18  understanding of which side proposed the changes that
19  you have testified to?
20      A.  This was proposed by the Clark County Association
21  of School Administrators and Professional Technical
22  Employees, specifically the part about there's no right
23  of return.
24      Q.  And how do you know that it was proposed by the
25  union if you weren't yet involved in negotiations when

**Page 31**

1  that was negotiated?
2      A.  Typically that would be considered a real give by
3  the union to -- and it would be something that normally
4  that you could expect that the district would have
5  proposed that.  So I asked Ms. Juhasz when I saw that
6  and I became chief negotiator how that occurred, and she
7  told me that, believe it or not that it was a union
8  proposal and not district's proposal.  So I asked Mr.
9  Augspurger if that was correct, and he said absolutely
10  it was the union's proposal.
11      Q.  And who is Mr. Augspurger?
12      A.  I'm sorry, that's A-U-G-S-P-U-R-G-E-R, is the
13  executive director of the Clark County Association of
14  School Administrators and Professional Technical
15  Employees.
16      Q.  Without knowing the exact date, do you know
17  approximately when the negotiations began as it related
18  to this agreement?
19      A.  Typically they start around February, but in this
20  case, again, I was not -- I was in a different division
21  so I don't know for sure when the negotiations started.
22      Q.  Fair enough.  We'll shift the focus for a moment.
23  Let me ask you about the RIF itself and how specific
24  positions were selected.
25          Actually, before I get to that let me ask about

**Page 32**

1  the transfer of the plaintiff to your division.  Who
2  made that request and how did it transpire?
3      A.  I received a call from Bramby Tollen, who was the
4  purchasing director, and I knew her.  She was a -- she
5  was a colleague.  And she asked me if I would consider
6  doing her a favor.  And I said, "Sure, what is the
7  favor?"  And she said, "Would you take Elena Rodriguez
8  into your division?"  And I said, "I've had very limited
9  interactions with her, but I've never had any conflicts
10  with her."  I said, "I would, but I don't have a
11  position to put her in."  And she said that, "No, no,"
12  she said, "this one would be in the gift category."
13      Q.  And what is the term "gift" mean in the context
14  that that conversation took place?
15      A.  It means that you're getting something -- you're
16  getting a unit or you're getting something that you
17  normally would not get.  Technically it's an off-ratio
18  position.  Positions in divisions are -- are by formula.
19  You get so many directors, you get so many principals
20  and so on.
21          And this would have been an off-ratio position.
22  I didn't have a position.  So in this case it meant that
23  I didn't have to place the employee in a particular
24  vacant position that I had, but that she would come or
25  the employee would come with the unit.  In other words,

**Page 33**

1  the funding would be -- would be shifted and added to
2  the unit.  Another posi -- an additional position would
3  be funded that's off ratio.  So if I was entitled to
4  ten, I would now have 11 positions.  In other words, she
5  came with the unit.
6      Q.  Now, let me ask you about the selection of
7  positions at the RIF stage.
8      A.  Okay.
9      Q.  How did you select the two positions that were
10  identified?
11      A.  We -- we were told -- the division was told that
12  the superintendent's directive was as that each
13  division, as I recall, had to eliminate two
14  administrative positions.  That's my recollection.
15  We -- the -- the administrators in the division -- in
16  this case it really would be Mr. -- primarily
17  Mr. Waldron and myself would decide which positions were
18  to be eliminated.
19          I was kind of surprised that we could eliminate
20  this off-ratio position.  But we were told you can
21  eliminate any two positions that are assigned to you,
22  and that position was assigned to the division.  It was
23  an extra position, so obviously -- you know Mr. Waldron
24  said, "That one is easy.  It wasn't ours to begin with.
25  We didn't have that position.  We're not entitled to it

EDWARD GOLDMAN - 10/24/2014

**Page 34**

1 by formula. So it's easy, that's the position that
2 goes."
3        And the other one, there was a vacancy. There
4 was a position, it was director, but the administrator
5 in that position had resigned or retired, I can't recall
6 exactly, and so there was a vacancy there. So if that
7 position was the second one eliminated, it wouldn't have
8 to result in any employee being reassigned or
9 potentially RIF'd. So that one was -- was very easy.
10 It made the most sense to eliminate the position that
11 was really kind of off ratio first and then -- then the
12 other one because it was vacant.
13    Q.  And when you say that was easy, you mean it made
14 the most sense?
15    A.  It made the most sense.
16        MR. HICKS:  I don't have any further
17 questions.
18        REDIRECT EXAMINATION
19 BY MR. SEGERBLOM:
20    Q.  Dr. Goldman, you indicated that Ms. Tollen called
21 you and asked you if you would take Ms. Rodriguez?
22    A.  Yes, out of the blue, absolutely.
23    Q.  And then I think previously you testified that
24 she had said that Ms. Rodriguez was trouble?
25    A.  Yes.  When I asked her why -- I -- I had no idea

**Page 35**

1 why she was asking me to take her, that's when she said
2 she was just trouble and -- I don't remember exactly
3 what she said, but words to the effect that she was just
4 tired of dealing with all the issues.
5    Q.  Did she tell you that my client had filed an EEOC
6 complaint against her?
7    A.  No.  Not that I recall, no.
8    Q.  Okay.  And that's not something you would know
9 about as part of this type of a transfer?
10    A.  No, not -- not in -- not as the associate in
11 charge of EOC, no.
12    Q.  Wouldn't the -- the district want people to know
13 that there was a pending EEOC claim by an employee?
14    A.  Well, you say the district, I --
15        MR. HICKS:  First of all, I'm going to
16 object.  It calls for speculation as to what, quote, the
17 district would or wouldn't want.
18        MR. SEGERBLOM:  I'll withdraw the question.
19 I guess we all know the answer, but that doesn't matter.
20    Q.  (BY MR. SEGERBLOM)  So -- it appears that if --
21 Ms. Juhasz told you that these negotiations had been
22 taking place for quite some time; is that correct?
23    A.  I don't know, I would say quite some time, but
24 this one was already done when I got the job because we
25 review where we were, where we are, what additional

**Page 36**

1 proposals we received or can -- we were going to make,
2 and that one was already done.
3    Q.  When did you get the job?
4    A.  I got the job as I recall sometime -- when I took
5 over, sometime in -- it was June, July is my
6 recollection.
7    Q.  Okay.  Is it your belief that Ms. Juhasz would
8 have known of the change that the union had made at the
9 time that my client received the second bad evaluation?
10    A.  Yeah, she -- she -- she would have.  It was
11 already -- it had already been agreed to.  And again, I
12 don't know when she would be -- that she would receive a
13 second evaluation.  I don't know for a fact that she
14 would know what her first evaluation was.  She could
15 have, but I don't know that.
16    Q.  All right.  Would Ms. Juhasz have access to my
17 client's personnel file so she could see if there was a
18 bad evaluation?
19    A.  She -- she would not have -- the personnel files
20 are kept in personnel, HR.  But she could request to see
21 it if it was necessary for dealing with a situation that
22 we were -- we were dealing with.  And so she could have
23 had ac -- she could have received it and asked -- asked
24 for it.  And she may have, I don't know.
25    Q.  What about is it available on a computer?  Can

**Page 37**

1 you just go online and?
2    A.  It's available on computer; but no, you can't go
3 online.  The access -- the access to various documents
4 are restricted.  It could be one division only, it could
5 be two or three divisions.  So no, you can't just --
6 everybody can't just go online and get that information.
7    Q.  Not everybody, but wasn't Ms. Juhasz in charge of
8 the Human Resources?
9    A.  No.
10    Q.  Who was in charge of Human Resources?
11    A.  I believe it was still -- I believe it was still
12 Martha Tiddle (phonetic).  I -- yeah, because -- or
13 maybe -- I don't recall if Dr. Vesneske was onboard
14 there.  She's the current one.  But she replaced Martha
15 Tiddle, I recall.
16    Q.  Okay.
17    A.  But I don't exactly what -- well, Ms. Tiddle left
18 in December, I remember that now so -- because she said
19 she was -- the end of the year she -- the calendar year
20 she was done.  And I don't know when Dr. Vesneske took
21 over, so I don't recall who was. . .
22    Q.  But do you know -- you belief that Ms. Juhasz
23 would not have just had access to my client's personnel
24 file online as part of her job?
25    A.  The -- the -- EMR was taken out of HR.  I don't

EDWARD GOLDMAN - 10/24/2014

1  know what the protocols were, whether at that point in
2  time she had access to evaluations on her own or that
3  was something that she would have had to have requested
4  from HR and they would have provided it.  So I don't
5  know for sure.
6      Q.  Okay.  Just a couple more.
7      A.  Sure.
8      Q.  Have you heard of something called DocDNA,
9  D-O-C-D-N-A?
10     A.  I don't recall that specific name being referred
11  to -- referred to it but --
12     Q.  Supposedly it's a computer program you can look
13  at personnel records?
14     A.  Yeah, there is one.  I don't know if it is called
15  that.
16     Q.  All right.  But you don't recall -- you don't
17  recall that HR had access through DocDNA or something
18  like that, computer program to anyone's personnel file?
19     A.  I don't know.  Again, EMR used to be part of
20  personnel.  When they separated -- when Dr. Awfa
21  (phonetic) separated the divisions and EMR was put under
22  the chief financial officer, I don't know what the
23  protocols and accesses that were established and who was
24  allowed access to which documents or not.
25         So Fran may have had access to it on her own or

1  she may have had to ask personnel, HR, I don't know.
2      Q.  Does EMR have access to EEO complaints?
3      A.  No.
4      Q.  Okay.
5      A.  That's the executive manager affirmative action
6  and diversity programs, and they never tell us about
7  EOC, unless it relates to something that we're doing and
8  they have to respond to.
9      Q.  Okay.
10     A.  "They" being the affirmative action officer.
11         MR. SEGERBLOM:  All right.  Piece of cake,
12  huh?
13  (Signature requested.)
14  (The proceedings concluded at 2:10 p.m.)
15
16
17
18
19
20
21
22
23
24
25

1              CERTIFICATE OF DEPONENT
2  PAGE    LINE      CHANGE                    REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16
17              * * * * *
18
        I, EDWARD GOLDMAN, deponent herein, do herby
19 certify and declare the within and foregoing
   transcription to be my deposition in said action; under
20 penalty of perjury; that I have read, corrected and do
   hereby affix my signature to said deposition.
21
22
23
        _____
24          EDWARD GOLDMAN, Deponent
25

1              REPORTER'S CERTIFICATE
2
3      I, Tammy M. Breed, CSR No. 305, Certified
4  Reporter, certify:
5      That the foregoing proceedings were taken before
6  me at the time and place therein set forth, at which
7  time the witness was put under oath by me;
8      That the testimony of the witness, the
9  questions propounded, and all objections and statements
10 made at the time of the examination were recorded
11 stenographically by me and were thereafter transcribed;
12     That the foregoing is a true and correct
13 transcript of my shorthand notes so taken.
14     I further certify that I am not a relative or
15 employee of any attorney of the parties, nor financially
16 interested in the action.
17     I declare under penalty of perjury under the laws
18 of Nevada that the foregoing is true and correct.
19 Dated this 7th day of November, 2014.
20
21
22
23       _____
         TAMMY M. BREED, C.C.R. No. 305
24
25

# EXHIBIT 25

```
 1              UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF NEVADA                CONDENSED
                                                        TRANSCRIPT
 3                              )
    ELENA RODRIGUEZ-MALFAVON,    )
 4                              )
               Plaintiff,        )
 5                              )
           vs.                   )    CASE NO.:
 6                              )    2:12-cv-1673-MMD-PAL
    CLARK COUNTY SCHOOL          )
 7  DISTRICT, EDWARD GOLDMAN     )
    and ANITA WILBUR,            )
 8                              )
               Defendants.       )
 9  _____ )

10

11

12

13

14         DEPOSITION OF EDWARD GOLDMAN

15          THURSDAY, DECEMBER 4, 2014

16                 1:57 P.M.

17         AT 700 SOUTH THIRD STREET

18              LAS VEGAS, NEVADA

19

20

21

22

23

24  REPORTED BY:  MICHELLE R. FERREYRA, CCR No. 876
                  JOB NO. 228869-C
25
```

EDWARD GOLDMAN - 12/04/2014

Page 2

```
 1              DEPOSITION OF EDWARD GOLDMAN,
 2   taken at 700 South Third Street, Las Vegas, Nevada, on
 3   THURSDAY, DECEMBER 4, 2014, at 1:57 p.m., before
 4   Michelle R. Ferreyra, Certified Court Reporter, in and
 5   for the State of Nevada.
 6   APPEARANCES:
 7   For the Plaintiff:
 8          LAW OFFICES OF RICHARD SEGERBLOM
            BY:  RICHARD SEGERBLOM, ESQ.
 9          700 South Third Street
            Las Vegas, NV 89101
10          (702) 388-9600
            (702) 385-2909 Fax
11          rsegerblom@lvcoxmail.com
12
     For Clark Defendants County School District, Anita
13   Wilbur and Edward Goldman:
14          LITTLER MENDELSON
            BY:  ETHAN D. THOMAS, ESQ.
15          3960 Howard Hughes Parkway
            Suite 300
16          Las Vegas, NV 89169
            (702) 862-8800
17          (702) 290-8420 Fax
            edthomas@littler.com
18
19
20
21
22
23
24
25
```

Page 3

```
 1                  I N D E X
 2   WITNESS:  EDWARD GOLDMAN
 3   EXAMINATION                                    PAGE
 4   Examination By Mr. Segerblom                     4
     Examination By Mr. Thomas                       10
 5   Further Examination By Mr. Segerblom            10
 6
 7
 8                    EXHIBITS
 9       EXHIBIT                                    PAGE
10   EXHIBIT 1 String of e-mails related to          4
             a process whereby the evaluation
11           was created for Ms. Rodriguez in
             June of 2011
12
13   EXHIBIT 2 Attachments to e-mails in
             Exhibit 1 string of e-mails             4
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1       LAS VEGAS, NEVADA, THURSDAY, DECEMBER 4, 2014;
 2                     1:57 P.M.
 3                      -oOo-
 4               (Exhibits 1 and 2 marked)
 5       (In an off-the-record discussion held prior to the
 6   commencement of the deposition proceedings, counsel
 7   agreed to waive the court reporter requirements under
 8   Rule 30(b)(4) of the Nevada Rules of Civil Procedure.)
 9
     Whereupon,
10
11              EDWARD GOLDMAN,
12   having been first duly sworn to testify to the truth,
13   the whole truth and nothing but the truth, was examined
14   and testified as follows:
15
16                   EXAMINATION
17   BY MR. SEGERBLOM:
18       Q.   Could you state your name, please?
19       A.   Sure.  Edward Goldman, G-o-l-d-m-a-n.
20       Q.   Dr. Goldman --
21       A.   Yes.
22       Q.   -- we're going to ask you some questions about
23   some e-mails that came to light after your last
24   deposition --
25       A.   All right.
```

Page 5

```
 1       Q.   -- but this should be pretty very perfunctory,
 2   hopefully.  The e-mails that came up involve an
 3   evaluation that was given to my client, Ms. Rodriguez,
 4   in June of 2011.
 5       A.   Okay.
 6       Q.   And in these series of e-mails, your name
 7   comes up, and it looks like you may have actually made
 8   some response at one point.  Do you recall
 9   independently being involved in the preparation of an
10   evaluation which my client received in June of 2011?
11       A.   Not in the preparation of it, I don't recall
12   anything, no.
13       Q.   Exhibit 1 are the e-mails.  I have them in
14   Bates stamp order, but they're actually chronologically
15   out of order, so I'll just refer you to the e-mails by
16   Bates stamp number.  If you look at 2165, the Bates
17   stamp is at the bottom right hand corner.
18       MR. THOMAS:  Right over here.
19       THE WITNESS:  Oh, I see.
20       MR. THOMAS:  Yes.
21       THE WITNESS:  So 2160-- I got it.  Okay.
22   Okay, yes.
23   BY MR. SEGERBLOM:
24       Q.   This appears to be an e-mail from Ms. Juhasz
25   to yourself?
```

EDWARD GOLDMAN - 12/04/2014

**Page 6**

1  A.  Okay.
2  Q.  It looks like she's basically just forwarding
3  something. And then 2169 appears to be your response?
4  A.  Okay.
5  Q.  If you want to take some time to look at it,
6  BUT having seen these, does this refresh your memory as
7  far as being involved in the preparation of this
8  evaluation?
9  A.  Not really.  I was copied on -- copied on a
10  lot of stuff that occurred between Fran and Anita. And
11  so in this case, they sent IT to me, like do you have
12  any changes or is there something that you see that is
13  not appropriate type thing.  And I am presuming I said,
14  No.  It's very good the way it is.  So that's why -- I
15  don't have any -- I didn't find anything in there that
16  was wrong or --
17  Q.  How would you characterize your role in this?
18  Were you the person who had ultimate authority to make
19  the decision or what was your involvement?
20  A.  I really didn't have any involvement.  I just
21  would review the -- I would review the documents.  And,
22  you know, being the division head, I would see if
23  there's something in there that I needed to not
24  understand or was not clear about or had a suggestion
25  to rephrase or something like that, if that were the

**Page 7**

1  case.  And if it were, I would give the suggestion back
2  to Ms. Juhasz, who was working with -- with Fran (sic),
3  and that was really the -- the extent of it.
4  Q.  As of June the 1st, 2011, do you recall what
5  your title was?
6  A.  I don't recall my exact -- I don't -- I can
7  tell you all my titles, but I can't tell you which
8  dates because we're right at that point where I
9  switched.  So when I was in charge of the ESD,
10  Educational Services Division, my title was Associate
11  Superintendent Educational Services Division.
12  Q.  In that capacity, you were over the area where
13  Ms. Wilbur and Ms. Rodriguez worked?
14  A.  Yes.
15  Q.  And then Ms. Juhasz just testified that as of
16  July the 1st, your title changed, and she started
17  reporting to you?
18  A.  Yeah.  Right -- right around there.  June or
19  July, yes.
20  Q.  Okay.
21  A.  And my title was Associate Superintendent
22  Employee Management Relations and Chief Negotiator.
23  Q.  All right.  Looking then at the same exhibit,
24  look at the first page, which is page 2163.
25  A.  Okay.

**Page 8**

1  Q.  This is an e-mail from Ms. Wilbur to -- I'm
2  sorry, from Ms. Juhasz to Ms. Wilbur.  It looks like it
3  was cc'd to you.
4  A.  Right.
5  Q.  And she states in the first sentence, The
6  evaluation is approved by Dr. Goldman for issuing.
7  A.  Right.
8  Q.  Would you characterize that as what you had
9  done?
10  A.  Yeah.  As, you know, okay to issue.  In other
11  words, it was fine the way it is and it was written
12  correctly, and there's nothing that I saw in there that
13  would prevent it from being issued.  And so I said,
14  Okay.  You can issue it.  I think all the division
15  heads were given evaluations to -- to look at or
16  documents before they were issued as kind of, you know,
17  a cursory type thing --
18  Q.  Right.
19  A.  -- and that's what happened.
20  Q.  Right.  But my question is:  Were you the one
21  who has had -- did you have approval authority?
22  A.  I don't know that I would call it approval
23  authority, that I had to approve it or not, but I
24  suppose I could have suggested other changes.  But
25  to -- to say -- to tell a principal not to issue one,

**Page 9**

1  there's -- that's -- I suppose, technically, I could
2  say do not issue.  But something had to be -- something
3  would have to be issued, so it would have to be issued
4  anyway, but that's --
5  Q.  Well, in this case --
6  A.  -- the way I would characterize it.
7  Q.  But in this case, the question is whether to
8  issue a satisfactory or unsatisfactory evaluation.  And
9  my question would be:  Did you have the authority to
10  say, no, give her a satisfactory evaluation as opposed
11  to unsatisfactory?
12  A.  No.  Because if it had certain items checked,
13  then it would be required that it be unsatisfactory.
14  Conversely, if everything was satisfactory and they had
15  checked unsatisfactory, then I would have told them
16  they can't do that.  They can't do that.  It can't be
17  completely satisfactory and then they mark it
18  unsatisfactory.  But, again, the same would be the
19  other way around, if there was unsatisfactory areas in
20  there, then there is no way I can tell them, Well, she
21  is totally unsatisfactory or partially, but go ahead
22  and make her satisfactory.  No.
23  MR. SEGERBLOM:  All right.  I don't have any
24  further questions.  Did you have any questions?
25  \\

EDWARD GOLDMAN - 12/04/2014

---

Page 10

1    MR. THOMAS:  Yes.  I just had one follow-up.
2
3                    EXAMINATION
4    BY MR. THOMAS:
5        Q.   Dr. Goldman, was it your decision to
6    ultimately rate her unsatisfactory?
7        A.   No.
8            MR. THOMAS:  That's all I have.
9            MR. SEGERBLOM:  All right.  Be right back.
10           (Off the record.)
11
12                  FURTHER EXAMINATION
13   BY MR. SEGERBLOM:
14       Q.   All right.  Just a couple of questions.
15       A.   Sure.
16       Q.   Ms. Juhasz' involvement in this evaluation,
17   was she authorized to recommend a satisfactory or
18   unsatisfactory evaluation?
19       A.   Only to the extent that the documents were the
20   evaluated documents by the evaluator didn't justify or
21   there was no evidence of it.  So everybody has an
22   evaluator.  That's the person who's responsible to
23   observe the person and so forth and keep record.  So
24   if -- again, if Ms. Juhasz had not found any
25   documentation to support any -- I'm referring to these

---

Page 11

1    ratings here -- any of these ratings, then she would
2    say, you know, everything here is satisfactory.  I
3    don't see how you can rate her unsatisfactory or
4    conversely.  There are four unsats here.  I don't see
5    how you could rate her satisfactory.  This is to the
6    evaluator, and he has to justify, you know, to her, or
7    even to me, ultimately, if that were to be the case.
8    So that's the extent of her recommendations, but not
9    decisions.
10           MR. THOMAS:  Just for the record, he was
11   pointing towards Exhibit 2 and Bates No. CCSD 0002252
12   and was pointing at the boxes on that document.
13   BY MR. SEGERBLOM::
14       Q.   But what if Ms. Juhasz is the one that said,
15   Check these boxes, as opposed to other boxes?
16       A.   I don't think that that would be appropriate,
17   except if the -- the -- if evaluated documents didn't
18   support it, she would say this eval -- if you are
19   basing your -- and I haven't seen them, but if you are
20   basing your unsat, for example, on assessment planning
21   on Document X, Document X is not unsatisfactory.  You
22   can rate her, Needs improvement.  That is enough in
23   there to do that.  Or, no, you would have to rate her
24   satisfactory, based on that document if the evaluator
25   provided it, if that -- if that should have

---

Page 12

1    occurred -- should have occurred.  That's all she could
2    have done.  And, again, it's just a recommendation.
3    She's not a -- she's not the supervisor.
4        Q.   Is she the final authority, "she" being
5    Ms. Juhasz for the District with respect to this
6    process?
7        A.   No.
8            MR. SEGERBLOM:  All right.  No further
9    questions.
10           MR. THOMAS:  None from me either.
11           (Thereupon, the deposition concluded at
12            2:10 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 13

CERTIFICATE OF DEPONENT

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |

* * * * *

I, EDWARD GOLDMAN, deponent herein, do hereby certify
and declare under the penalty of perjury the within and
foregoing transcription to be my deposition in said
action; that I have read, corrected and do hereby affix
my signature to said deposition.


                    _____
                    EDWARD GOLDMAN, Deponent

---