**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

ELENA RODRIGUEZ-MALFAVON,

　　　　　Plaintiff,

　v.

CLARK COUNTY SCHOOL DISTRICT,
EDWARD GOLDMAN, and ANITA
WILBUR,

　　　　　Defendants.

Case No. 2:12-CV-1673-APG-PAL

**ORDER GRANTING IN PART AND
DENYING IN PART MOTION FOR
SUMMARY JUDGMENT**

(Dkt. #39)

Plaintiff Elena Rodriguez-Malfavon brought this lawsuit against defendants Clark County School District ("CCSD"), Edward Goldman, and Anita Wilbur. Rodriguez-Malfavon alleges the defendants discriminated against her based on her race and national origin; retaliated against her when she complained about the alleged discrimination; and retaliated against her for complaining that Wilbur was audio recording teachers, parents, and students at a school. The defendants move for summary judgment on each of Rodriguez-Malfavon's claims.

I grant in part and deny in part the motion. Genuine issues of fact remain as to whether defendant CCSD retaliated against Rodriguez-Malfavon based on her complaints of discrimination while she was in the purchasing department. I therefore deny defendant CCSD's motion for summary judgment on her retaliation claims under Title VII and 42 U.S.C. § 1983. But because no genuine issues of fact remain on her other claims, I grant the remainder of the defendants' motion.

## I. BACKGROUND

Rodriguez-Malfavon, a Caucasian of Cuban-American national origin, began working for CCSD in a clerical position in the human resources division in 1990. (Dkt. #39-1 at 3-4, 11; Dkt. #46-1 at 1.) She was later promoted to an administrative position in which she supervised 16 employees. (Dkt. #39-1 at 5.) She then transferred to another department to work on a software

program. (*Id.*)  In January 2009, that department was eliminated, so Rodriguez-Malfavon was transferred to the purchasing department. (*Id.* at 6-7.)  Following the transfer, she retained her administrative position. (*Id.* at 8.)  Her initial supervisor was Alan Ringhofer, who gave her a positive evaluation in June 2009, ranking her satisfactory in all categories. (*Id.* at 8; Dkt. #46-2 at 2.)  The evaluation stated that Rodriguez-Malfavon had "blended well into [the] team." (Dkt. #46-2 at 2.)

In September 2009, Ringhofer's supervisor, Bramby Tollen, became Rodriguez-Malfavon's supervisor. (Dkt. #39-1 at 18; Dkt. #46-1 at 1.)  In late September, Tollen placed Rodriguez-Malfavon in charge of supervising some of the buyers in the purchasing department. (Dkt. #46-1 at 1.)  According to Rodriguez-Malfavon, Tollen told her she was being given these supervisory duties because she had been doing such a great job. (*Id.*)

Shortly thereafter, Rodriguez-Malfavon sent an email to Tollen's supervisor, Jeff Weiler, requesting a transfer back to human resources. (Dkt. #39-1 at 45; Dkt. #39-2 at 2; Dkt. #46-2 at 6.)  Rodriguez-Malfavon informed Weiler that she had transferred to the purchasing department on the understanding that she would continue to work on the software program but that was not what happened. (Dkt. #39-2 at 2.)  Rodriguez-Malfavon's email did not contain any allegation of discrimination. (*Id.*; Dkt. #46-1 at 1.)

About a week later, Tollen initiated a meeting regarding Rodriguez-Malfavon's email to Weiler. (Dkt. #39-1 at 49; Dkt. #39-2 at 5; Dkt. #46-2.)  In a November 9 summary of this meeting, Tollen stated that Rodriguez-Malfavon had never told Tollen that she was unhappy in the purchasing department and wanted a transfer. (Dkt. #39-2 at 5.)  Tollen directed Rodriguez-Malfavon to "[f]ollow protocol and afford the chain of command an opportunity to address your concerns before elevating them over your supervising administrator." (*Id.*)  During that meeting, Rodriguez-Malfavon stated that she had been treated differently since arriving in the purchasing department and that she intended to discuss this different treatment with Tom Rodriguez, Executive Manager of the Diversity and Affirmative Action Programs. (*Id.* at 29; Dkt. #46-2 at 15-16.)

1    Tollen held another meeting on November 13 to discuss Rodriguez-Malfavon's weekly

2  duties. (Dkt. #39-2 at 12.)  According to the memo documenting this meeting, Tollen had directed

3  Rodriguez-Malfavon to move to another desk but Rodriguez-Malfavon had not done so. (*Id.*)

4  Tollen also indicated that Rodriguez-Malfavon no longer had supervisory responsibilities over the

5  purchasing staff so Rodriguez-Malfavon should refrain from answering their questions and

6  instead direct them to their supervisors. (*Id.*)

7    On November 22, Rodriguez-Malfavon sent an email to Rodriguez stating that she wanted

8  to file discrimination and harassment charges against Tollen. (*Id.* at 15; Dkt. #46-2 at 25.)  The

9  next day, she sent an email to Weiler informing him that Tollen moved her from her office to a

10  cubicle and took away her supervisory duties. (Dkt. #46-2 at 27.)  She also advised Weiler that

11  she had contacted Rodriguez about filing discrimination and harassment charges against Tollen.

12  (*Id.*)

13    A few days later, Tollen held another meeting with Rodriguez-Malfavon. (Dkt. #46-3 at

14  2.)  During that meeting, Rodriguez-Malfavon was asked why she sent the second email to Weiler

15  when she had previously been directed to follow the chain of command. (*Id.*)  Rodriguez-

16  Malfavon responded that, pursuant to a CCSD regulation, when she is complaining about her

17  direct supervisor, she should file discrimination charges with the next administrator in line or the

18  manager of the diversity program. (*Id.*)  Rodriguez-Malfavon was then told to comply with all

19  directives from her supervisor. (*Id.* at 7.)

20    On December 2, Rodriguez-Malfavon sent another email to Rodriguez alleging disparate

21  treatment. (Dkt. #39-2 at 20.)  Among the incidents Rodriguez-Malfavon identified were not

22  being invited to a monthly administrators meeting that all other administrators attended, not being

23  invited to two different luncheons that all other administrators attended, being told to change

24  clothes for a meeting, having to work in a cubicle even though other administrator had offices,

25  and having her supervisory duties taken away. (*Id.* at 20-24.)  Rodriguez-Malfavon also

26  mentioned having to formally request time off when other administrators were not required to do

27  so. (*Id.* at 22, 24.)  According to Rodriguez-Malfavon, Tollen admitted to treating her differently

28

1   because Tollen felt that she was not working enough overtime hours to take leave without having

2   to request it. (*Id.* at 21.)  Rodriguez-Malfavon also stated that Tollen directed her not to

3   communicate with Tollen by email or drop things off at Tollen's office. (*Id.* at 25.)  Instead,

4   Rodriguez-Malfavon was to communicate with Tollen at weekly staff meetings. (*Id.*)

5       The next day, Tollen issued an oral warning advising Rodriguez-Malfavon that her

6   "performance is seriously below standard and must improve." (Dkt. #39-1 at 50-51; Dkt. #39-2 at

7   9.)  According to the oral warning, Rodriguez-Malfavon falsely claimed she had worked late on

8   two days to make up time even though she had not worked the extra hours. (Dkt. #39-2 at 9.)

9   Additionally, the oral warning stated that Rodriguez-Malfavon continued to answer staff

10   members' questions even though she had been told to refer them to their supervisors. (Id.)  It also

11   noted that she continued to send emails to Tollen and drop off documents at Tollen's office

12   throughout the week despite being previously directed not to do so. (*Id.* at 9-10.)  Finally, the oral

13   warning mentioned Rodriguez-Malfavon's second email to Weiler and that Rodriguez-Malfavon

14   had indicated that she did not believe this email violated the directive to follow the chain of

15   command. (*Id.* at 10.)  Rodriguez-Malfavon was told to comply with all supervisory directives.

16   (*Id.*)

17       On March 11, 2010, Ringhofer and Steve Staggs, assistant director in the purchasing

18   department, issued a summary of a meeting they held with Rodriguez-Malfavon to discuss sick

19   leave policy. (Dkt. #39-2 at 45.)  They also discussed how in their view, Rodriguez-Malfavon was

20   taking too long to complete assigned tasks and that she was involving support staff in matters that

21   did not concern them. (*Id.* at 45-46.)

22       On April 12, Rodriguez-Malfavon filed a charge of discrimination with the EEOC. (Dkt.

23   #39-1 at 41; Dkt. #39-2 at 49.)  In her charge, she alleged race and national origin discrimination,

24   and retaliation. (Dkt. #39-2 at 49.)

25       On June 24, Rodriguez-Malfavon received a performance evaluation signed by Ringhofer.

26   (Dkt. #39-1 at 54; Dkt. #39-2 at 56.)  Ringhofer rated Rodriguez-Malfavon "satisfactory" in three

27   categories, "needs improvement" in two categories, and "not satisfactory" in two categories. (Dkt.

28

1  #39-2 at 56.)  Her overall performance was rated not satisfactory. (*Id.*)  Among the deficiencies

2  noted were that she was not performing at the level of an administrator and that her supervisory

3  responsibilities were removed after she expressed an inability to do the job. (*Id.*)  The evaluation

4  also stated that "[f]rom day one in the department, she has been more concerned with

5  documenting perceived slights and the behavior of others . . . rather than looking to increase her

6  knowledge and responsibilities . . . ." (Dkt. #46-3 at 13.)

7      On August 9, 2010, Rodriguez-Malfavon transferred from the purchasing department to

8  the Academy for Individualized Study High School ("AIS"). (Dkt. #39-1 at 9; Dkt. #39-3 at 38.)

9  According to defendant Edward Goldman, who was the associate superintendent of the

10  educational services division, Tollen asked him if he would take Rodriguez-Malfavon into his

11  division. (Dkt. #39-3 at 4, 18.)  Goldman agreed because Tollen would transfer Rodriguez-

12  Malfavon along with the funding for her position, so Goldman would not have to find a position

13  in his division for her. (*Id.* at 18-19.)  According to Goldman, Tollen said Rodriguez-Malfavon

14  was "trouble" and Tollen was "tired of dealing with all the issues." (*Id.* at 20-21.)

15      In Rodriguez-Malfavon's new position, her supervisor was defendant Anita Wilbur. (Dkt.

16  #39-1 at 9.)  When Rodriguez-Malfavon first started at AIS, she asked whether Wilbur had

17  checked with the legal department about the legality of the video cameras that were installed at

18  the school. (Dkt. #46-7 at 4.)  Wilbur said she had already gone through that process. (*Id.*)

19  Rodriguez-Malfavon also asked whether the cameras recorded audio and Wilbur said they did

20  not. (Dkt. #39-3 at 70.)  In February 2011, Rodriguez-Malfavon told Wilbur's supervisor, Isaac

21  Stein, about the cameras. (Dkt. #39-6 at 26, 29; Dkt. #39-1 at 77-78.)

22      In March 2011, Wilbur and Rodriguez-Malfavon were discussing another employee,

23  Alberta Montero. (Dkt. #39-1 at 12.)  According to Rodriguez-Malfavon, Wilbur stated that

24  Montero was rude, crude, and had no people skills because of where Montero was from. (*Id.*)

25  Rodriguez-Malfavon asked Wilbur what she meant, and Wilbur responded that Montero was from

26  Cuba. (*Id.*)  Rodriguez-Malfavon told Wilbur that she was also from Cuba and Montero's

27  personality had nothing to do with being from Cuba. (*Id.*)

28

1   At the end of March, Rodriguez-Malfavon met with Stein to discuss Wilbur's alleged

2   audio taping of employees, students, and parents. (Dkt. #46-1 at 2-3.)  Rodriguez-Malfavon also

3   complained to Brad Waldron, Stein's supervisor, about the cameras. (Dkt. #39-1 at 79; Dkt. #39-3

4   at 27.)  In mid-April, another CCSD employee, Kristin Slaveck, also complained to Waldron and

5   Stein regarding the cameras at the school. (Dkt. #39-3 at 50; Dkt. #39-4 at 57.)  About two weeks

6   later, Stein advised Wilbur that they would have a meeting regarding the alleged audio taping.

7   (Dkt. #46-4 at 2.)  At the meeting, Wilbur said the cameras did not capture audio. (Dkt. #39-3 at

8   28-29.)  Stein investigated with the technical staff at AIS and confirmed that this was true. (Dkt.

9   #39-6 at 32-33.)

10   On May 2, 2011, Rodriguez-Malfavon received a notice that due to a reduction in force,

11   her position had been identified for elimination and she would be subject to the reduction in force

12   process. (Dkt. #39-5 at 6.)  Goldman made the decision to eliminate her position after the

13   superintendent decreed that every division eliminate two administrative positions. (Dkt. #39-3 at

14   8, 19-20.)  According to Goldman, Rodriguez-Malfavon's position was "easy" to eliminate

15   because it was not that division's position anyway. (*Id.*)  The other position he chose to eliminate

16   was a vacancy, which he chose because that would not result in anyone losing their position. (*Id.*)

17   Although Rodriguez-Malfavon's position was identified for elimination, that did not necessarily

18   mean she would be terminated.  Instead, a more senior employee could "bump" a less senior

19   employee from his or her position under the reduction in force process. (*Id.* at 13.)

20   The reduction in force procedures under the union contract then in effect provided that

21   volunteers would be the first to be let go, followed by administrators who had twice been rated as

22   unsatisfactory within the last two years. (*Id.* at 10.)  The procedures further provided that an

23   administrator who was reduced in force because of two unsatisfactory ratings would be demoted

24   to a non-administrative position and would have no right to go back to an administrative position

25   if one opened up. (*Id.* at 11-12.)

26   On May 19, Stein issued a summary of his April meeting with Wilbur regarding the

27   cameras. (Dkt. #46-4 at 4.)  Stein concluded that Wilbur had not been audiotaping, but he gave

28

1    Wilbur several directives, including not to retaliate against any employees. (Dkt. #46-4 at 3; Dkt.

2    #48-8 at 16.)  According to Stein, the directive not to retaliate was common language to include.

3    (Dkt. #39-3 at 30.)  A few days later, Wilbur gave Rodriguez-Malfavon an oral warning for not

4    documenting her time correctly, not using a new time clock for 17 days after the mandatory

5    implementation of the new time clock procedure, not ensuring other employees received fire keys

6    and shelter-in-place bins, and not timely evaluating a subordinate employee. (Dkt. #39-4 at 2;

7    Dkt. #46-1 at 3.)

8         On June 2, Wilbur gave Rodriguez-Malfavon an unsatisfactory evaluation, rating her

9    satisfactory in one category and not satisfactory in four categories. (Dkt. #39-3 at 37.)  The not

10   satisfactory rating was based on Rodriguez-Malfavon failing to distribute the shelter-in-place bins

11   and fire keys, failing to timely evaluate another employee, and failing to use the time clock on the

12   mandatory start date. (*Id.* at 38.)  Wilbur denies she knew of Rodriguez-Malfavon's prior

13   unsatisfactory evaluation. (Dkt. #39-3 at 69; Dkt. #46-7 at 12.)  She also denies that Stein told her

14   who complained about the alleged audio taping. (Dkt. #39-3 at 70-71.)

15        Rodriguez-Malfavon was subsequently informed that because her position was being

16   eliminated and because she had two unsatisfactory evaluations, she would be assigned to a

17   support staff position for the upcoming school year. (Dkt. #39-6 at 7.)  On June 30, 2011,

18   Rodriguez-Malfavon went to work for the early childhood department, where she continues to

19   work for CCSD. (Dkt. #39-1 at 9.)

20        Rodriguez-Malfavon brought this lawsuit against CCSD, Wilbur, and Goldman, alleging

21   national origin discrimination under Title VII, retaliation under Title VII, discrimination and

22   retaliation under 42 U.S.C. §§ 1981 and 1983, and First Amendment retaliation under § 1983.

23   The defendants move for summary judgment.

24   **II. ANALYSIS**

25        Summary judgment is appropriate if the pleadings, discovery responses, and affidavits

26   demonstrate "there is no genuine dispute as to any material fact and the movant is entitled to

27   judgment as a matter of law." Fed. R. Civ. P. 56(a), (c).  A fact is material if it "might affect the

28

outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000).  I view the evidence and reasonable inferences in the light most favorable to the non-moving party. *James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 920 (9th Cir. 2008).

### A. Race and National Origin Discrimination

Title VII prohibits an employer from "discriminat[ing] against any individual . . . because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a)(1).  In a Title VII case, the plaintiff bears the initial burden of proving a prima facie case of discrimination by a preponderance of the evidence. *Hawn v. Exec. Jet Mgmt.*, 615 F.3d 1151, 1155 (9th Cir. 2010).  A plaintiff may establish a prima facie case by showing: (1) she is a member of a protected class; (2) she was qualified for her position and performing her job satisfactorily; (3) she experienced an adverse employment action; and (4) "similarly situated individuals outside [her] protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Id.* at 1156 (quotation omitted).

If the plaintiff makes out a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* at 1155.  If the defendant does so, then the plaintiff must prove by a preponderance of the evidence that the defendant's proffered reasons were "a mere pretext for unlawful discrimination." *Id.*

The plaintiff may prove discriminatory intent through direct or circumstantial evidence. *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1194 (9th Cir. 2003). Discriminatory intent can be shown, for example, by "showing that the employer's proffered

1    explanation is unworthy of credence because it is internally inconsistent or otherwise not

2    believable." *Id.* (quotation omitted).  These same standards apply to discrimination claims under

3    42 U.S.C. § 1981 and § 1983. *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138, 1144 (9th Cir.

4    2006); *Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d 1169, 1180 n.11 (9th Cir. 1998).

5                        *1.  Race Discrimination*

6            Rodriguez-Malfavon does not present any argument in support of her race discrimination

7    claims under Title VII, § 1981, or § 1983.  She identifies herself as Caucasian.  She has not

8    identified any similarly situated individual who was not Caucasian who was treated more

9    favorably.  Nor has she identified any other circumstances giving rise to an inference of race-

10   based discrimination.  She therefore has not made out even a prima facie case of race

11   discrimination, much less raised an issue of fact that the defendants' non-discriminatory reasons

12   for their actions were pretext for race discrimination.  Consequently, I grant the defendants'

13   summary judgment motion on Rodriguez-Malfavon's race discrimination claims.

14                       *2.  National Origin Discrimination*

15           Rodriguez-Malfavon does not present any argument in support of her national origin

16   discrimination claims under Title VII, § 1981, or § 1983.  She identifies as Cuban-American.

17   With respect to her time in the purchasing department, she presents evidence that she was treated

18   differently than other administrators.  But she does not point to any evidence that the other

19   administrators were outside her protected class or that they were similarly situated.  Indeed, she

20   admitted that in some respects the other administrators were not similarly situated. (Dkt. #39-1 at

21   31-32 (Rodriguez-Malfavon stating that she had a gut feeling she was being discriminated against

22   because she was being treated differently but admitted no one else was being trained like she

23   was).)  She therefore has not made out a prima facie case of national origin discrimination.  Even

24   if she had, the defendants present non-discriminatory reasons for their actions based on

25   Rodriguez-Malfavon's performance deficiencies.  She has presented no evidence or argument that

26   the defendants' actions were pretext for national origin discrimination.

27

28

1         With respect to Rodriguez-Malfavon's time at AIS, she has presented evidence that

2    Wilbur once made a comment about another employee who was from Cuba. "Discriminatory

3    remarks are relevant evidence that, along with other evidence, can create a strong inference of

4    intentional discrimination." *Mustafa*, 157 F.3d at 1180. However, "there must be a sufficient

5    nexus between the alleged discriminatory remarks and the adverse employment decision." *Id.*

6    Here, there was one remark about another employee from Cuba being rude, crude, and unable to

7    interact with others. There is no evidence Wilbur made a similar comment about Rodriguez-

8    Malfavon. Nor were any of the disciplinary actions taken against her based on her being rude,

9    crude, or unable to interact with others. Rather, Wilbur disciplined Rodriguez-Malfavon for

10   failing to perform certain identified tasks. Rodriguez-Malfavon has not pointed to any evidence

11   of other circumstances giving rise to an inference of national origin discrimination. She also has

12   not shown that Wilbur treated similarly situated employees outside her protected class differently.

13   She therefore has not made out a prima facie case of national origin discrimination.

14        Even if she had, the defendants present non-discriminatory reasons for their actions based

15   on Rodriguez-Malfavon's failure to perform certain tasks. She has presented no argument or

16   evidence that the defendants' explanations are pretext for national origin discrimination.

17   Consequently, I grant the defendants' summary judgment motion on Rodriguez-Malfavon's

18   national origin discrimination claims.

19       **B. Retaliation under Title VII**

20        To establish a prima facie case of retaliation under Title VII, a plaintiff must show that

21   "(1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3)

22   there was a causal link between her activity and the employment decision." *Raad*, 323 F.3d at

23   1196-97. Protected activity includes the filing of a charge or a complaint, including an informal

24   complaint to a supervisor. *Ray v. Henderson*, 217 F.3d 1234, 1240 n.3 (9th Cir. 2000); 42 U.S.C.

25   § 2000e-3(a). For a retaliation claim, an adverse employment action is "any adverse treatment

26   that is based on a retaliatory motive and is reasonably likely to deter the charging party or others

27   from engaging in a protected activity." *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 970

28

1    (9th Cir. 2001) (quotation omitted). "Transfers of job duties and undeserved performance ratings,

2    if proven, would constitute 'adverse employment decisions.'" *Yartzoff v. Thomas*, 809 F.2d 1371,

3    1376 (9th Cir. 1987).

4           To establish the causal link, the plaintiff must present "proof that the desire to retaliate

5    was the but-for cause of the challenged employment action." *Univ. of Tex. Southwestern Med.*

6    *Ctr. v. Nassar*, --- U.S. ----, 133 S. Ct. 2517, 2528 (2013). "This requires proof that the unlawful

7    retaliation would not have occurred in the absence of the alleged wrongful action or actions of the

8    employer." *Id.* at 2533. "However, 'but-for' causation does not require proof that retaliation was

9    the only cause of the employer's action, but only that the adverse action would not have occurred

10   in the absence of the retaliatory motive." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845-46

11   (2d Cir. 2013). The Supreme Court recently explained "but-for" causation, including where a

12   result is caused by multiple factors:

13           Thus, where A shoots B, who is hit and dies, we can say that A actually caused B's
             death, since but for A's conduct B would not have died. The same conclusion
14           follows if the predicate act combines with other factors to produce the result, so
             long as the other factors alone would not have done so—if, so to speak, it was the
15           straw that broke the camel's back. Thus, if poison is administered to a man
             debilitated by multiple diseases, it is a but-for cause of his death even if those
16           diseases played a part in his demise, so long as, without the incremental effect of
             the poison, he would have lived.
17

18   *Burrage v. United States*, --- U.S. ----, 134 S. Ct. 881, 888 (2014) (internal quotation marks and

19   citations omitted).

20          A plaintiff may prove that retaliation was a but-for cause of an adverse employment action

21   by showing the employer's explanation for the adverse actions was pretextual, such as by

22   "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's

23   proffered legitimate, nonretaliatory reasons for its action." *Zann Kwan*, 737 F.3d at 845-46.

24   Additionally, causation "may be inferred from proximity in time between the protected action and

25   the allegedly retaliatory employment decision." *Ray*, 217 F.3d at 1244.

26          Viewing the evidence and reasonable inferences in the light most favorable to Rodriguez-

27   Malfavon, she has presented evidence raising issues of fact that she engaged in protected activity,

28

that she suffered adverse employment actions, and that but for her protected activity, the adverse
actions would not have occurred.  Rodriguez-Malfavon made an informal complaint during the
conference with Tollen regarding Rodriguez-Malfavon's first email to Weiler.  Within a month,
Tollen removed her supervisory duties despite indications during that meeting that she was doing
a good job up to that point. (Dkt. #46-2 at 16.)

Additionally, Rodriguez-Malfavon made more formal complaints to the diversity manager
and Tollen's supervisor in late November and early December.  Within a week or two of those
complaints, she received an oral warning from Tollen.  The oral warning specifically referenced
her second email to Weiler and ordered her to comply with all supervisory directives, including,
presumably, the one to follow the chain of command.

Rodriguez-Malfavon then filed a formal EEOC charge in April 12.  About a month and a
half later, she received a nonsatisfactory performance evaluation from Ringhofer, who is Tollen's
subordinate.  That evaluation stated that "[f]rom day one in the department, she has been more
concerned with documenting perceived slights and the behavior of others . . . rather than looking
to increase her knowledge and responsibilities . . . ." (Dkt. #46-3 at 13.)  Yet Ringhofer had given
Rodriguez-Malfavon a satisfactory review in June 2009 which did not mention any of these
alleged problems existing from "day one" of her time in the purchasing department.  Instead,
Ringhofer's June 2009 evaluation stated that Rodriguez-Malfavon had blended well into the team.
Additionally, when Tollen requested Goldman take Rodriguez-Malfavon into his division, she
told Goldman that Rodriguez-Malfavon was "trouble." *See Sayger v. Riceland Foods, Inc.*, 735
F.3d 1025, 1032 (8th Cir. 2013) (stating that evidence a manager referred to those who filed
complaints as "troublemakers" was, in addition to other factors, circumstantial evidence that
protected activity was the but-for cause of disciplinary action against the complaining
employees).

In sum, the temporal proximity of the protected activity and the adverse actions, combined
with the inconsistencies between her June 2009 review and the June 2010 review, as well as the
abrupt change in the positive view of her work after her complaints, raise genuine issues of fact as

1   to whether her protected activity was the but-for cause of the series of adverse actions taken

2   against her while in the purchasing department.  I therefore deny the defendants' motion with

3   respect to the Title VII retaliation claim based on Rodriguez-Malfavon's time in the purchasing

4   department.

5          However, no genuine issue of fact remains that Rodriguez-Malfavon was not retaliated

6   against at AIS based on engaging in protected activity covered by Title VII.  Rodriguez-Malfavon

7   does not argue that the discipline she received at AIS was retaliation for her prior complaints

8   under Title VII.  Moreover, Rodriguez-Malfavon's complaint alleging discrimination against

9   another supervisor in a different division over a year prior to any discipline Rodriguez-Malfavon

10  received at AIS does not give rise to an inference of retaliation. *See Manatt v. Bank of Am., NA*,

11  339 F.3d 792, 802 (9th Cir. 2003) (holding nine months between protected activity and adverse

12  actions was too long to support an inference of retaliation).  I therefore grant the defendants'

13  motion as to the Title VII retaliation claim based on Rodriguez-Malfavon's time at AIS.

14         **C. First Amendment Retaliation under § 1983**

15         A public employer may not retaliate against its employees for their exercise of First

16  Amendment protected speech activities. *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1068

17  (9th Cir. 2012); *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).  But a public employer has

18  an interest in regulating its employees' speech. *Karl*, 678 F.3d at 1068.  To balance these

19  concerns, the courts employ a five-part test to evaluate an employee's First Amendment

20  retaliation claim.

21         First, the plaintiff must show that she "spoke on a matter of public concern." *Id.*  "Speech

22  involves a matter of public concern when it can fairly be considered to relate to any matter of

23  political, social, or other concern to the community." *Eng*, 552 F.3d at 1070 (quotation omitted).

24  For example, speech that "exposes government wrongdoing or helps the public evaluate the

25  performance of public agencies" generally will constitute matters of public concern. *Karl*, 678

26  F.3d at 1069.  In contrast, "speech that deals with individual personnel disputes and grievances"

27  generally does not rise to the level of a matter of public concern. *Eng*, 552 F.3d at 1070 (quotation

28

omitted).  Whether an employee's speech touches on a matter of public concern is a question of law that I determine based on the speech's "content, form, and context . . . as revealed by the whole record." *Id.* (quotation omitted).

Second, the plaintiff must show she "spoke as a private citizen and not within the scope of her official duties as a public employee." *Karl*, 678 F.3d at 1068.  An employee speaks as a private citizen if she "had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform." *Eng*, 552 F.3d at 1071 (quotation omitted).  The scope of the plaintiff's job is a question of fact, but the ultimate conclusion of whether the plaintiff spoke as a private citizen is a question of law. *Id.*

If the plaintiff makes these two showings, she then must show that she "suffered an adverse employment action, for which [her] protected speech was a substantial or motivating factor." *Karl*, 678 F.3d at 1068.  The defendant's mere knowledge of the protected speech does not suffice to show the causal link. *Bd. Of Cnty. Commissioners v. Umbehr*, 518 U.S. 668, 685 (1995).  If there is no direct evidence of retaliatory motive, the plaintiff must present circumstantial evidence, such as proximity in time between the protected speech and the adverse action or that the employer's proffered explanations for the adverse actions were pretextual. *Ulrich v. City & Cnty. of S.F.*, 308 F.3d 968, 980 (9th Cir. 2002).  This step is a question of fact. *Eng*, 552 F.3d at 1071.  If the plaintiff makes these three showings, she states a prima facie case of First Amendment retaliation. *Karl*, 678 F.3d at 1068.

The burden then shifts to the public employer at step four to show its "legitimate administrative interests outweigh the employee's First Amendment rights." *Eng*, 552 F.3d at 1071 (quotation omitted).  This is a mixed question of law and fact. *Id.*  Alternatively, if the public employer fails to meet this burden, it can show at step five that it "would have taken the adverse employment action even absent the protected speech." *Karl*, 678 F.3d at 1068.  "In other words, it may avoid liability by showing that the employee's protected speech was not a but-for cause of the adverse employment action." *Eng*, 552 F.3d at 1072.  Under this fifth and final step, the employer must show that even if it had both proper and improper bases to take the adverse action,

1    it "would have taken the adverse action if the proper reason alone had existed." *Id.*  This is a

2    question of fact. *Id.*

3            Assuming Rodriguez-Malfavon has established her prima facie case, the defendants have

4    presented evidence that they would have taken the adverse actions against her even if she had not

5    engaged in protected speech, because of job performance issues.  Rodriguez-Malfavon responds

6    by arguing that she was given two different reasons for why she was subject to the reduction in

7    force.  She also argues that if she can show the June 2011 unsatisfactory evaluation was

8    retaliatory, then she can show that but for the retaliation, she would not have been demoted as a

9    result of the second reduction in force.

10           However, even viewing the evidence and inferences in the light most favorable to

11   Rodriguez-Malfavon, there were not two reductions in force nor were contradictory reasons given

12   for the reduction in force.  It is undisputed that there was a district-wide reduction in force and

13   that the superintended told all divisions to eliminate two administrative positions.  Goldman

14   testified that he chose Rodriguez-Malfavon's position because it was not that division's position

15   originally.  Rodriguez-Malfavon has not disputed that this was a valid, non-retaliatory reason to

16   eliminate her position, nor has she presented evidence raising an issue of fact that but for her

17   complaints about Wilbur's audio taping, Goldman would have made a different choice.

18           Further, the fact that Goldman eliminated her position did not mean she would be

19   terminated.  Instead, it meant she would be subjected to the reduction in force procedures then in

20   place.  At the time she received the first reduction in force notice, Rodriguez-Malfavon had only

21   one unsatisfactory review.  But once she received her second unsatisfactory evaluation, she was

22   subject to removal from an administrator position and hence received a second reduction in force

23   notice advising her of this result.  There was only one reduction in force and the second notice

24   merely advised her of the changed circumstances of her second negative evaluation, which

25   affected how she would be treated under the reduction in force.  Consequently, there was no

26   second reduction in force as Rodriguez-Malfavon argues.  Nor is there a genuine issue of fact as

27   to whether she was given contradictory reasons for why she was subject to the reduction in force.

28

1          Rodriguez-Malfavon also contends that if she can show the June 2011 evaluation was

2    retaliatory, then she can show she would not have been demoted.  That is not a correct statement

3    of the law.  That the speech was a motivating factor for the adverse action is already a part of

4    Rodriguez-Malfavon's prima facie case.  As explained in *Eng*, the fifth step "relates to, but is

5    distinct from, the plaintiff's burden to show the protected conduct was a substantial or motivating

6    factor.  It asks whether the adverse employment action was based on protected and unprotected

7    activities, and if the state would have taken the adverse action if the proper reason alone had

8    existed." 552 F.3d at 1072 (quotation omitted).  Simply stating that the negative evaluation was

9    retaliatory therefore does not rebut the defendants' argument that they still would have given her

10   the negative evaluation based on poor performance even if she had not complained about the

11   audio recording.  Rodriguez-Malfavon has not argued nor identified evidence showing that her

12   performance failures alone would not have resulted in the negative evaluation.

13         I will not scan the record to find a triable issue of fact on Rodriguez-Malfavon's behalf.

14   *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (noting that it is not the district court's task

15   "to scour the record in search of a genuine issue of triable fact" (quotation omitted)).  At the

16   summary judgment stage, Rodriguez-Malfavon must "identify with reasonable particularity the

17   evidence that precludes summary judgment." *Id.* (quotation omitted).  She has not done so with

18   respect to the defendants' argument that retaliation was not the but-for cause of the negative

19   evaluation.  I therefore grant their summary judgment motion on her First Amendment retaliation

20   claim.

21   **III. CONCLUSION**

22         IT IS THEREFORE ORDERED that defendants Clark County School District, Edward

23   Goldman, and Anita Wilbur's motion for summary judgment **(Dkt. #39) is GRANTED in part**

24   **and DENIED in part.**  The motion is granted as to plaintiff Elena Rodriguez-Malfavon's claims

25   for race discrimination, national origin discrimination, Title VII retaliation based on her time at

26   AIS, and First Amendment retaliation.  The motion is denied as to the plaintiff's Title VII

27

28

1    retaliation claim against defendant Clark County School District based on her time in the

2    purchasing department.

3        IT IS FURTHER ORDERED that the parties shall file a proposed joint pretrial order as

4    required under the Local Rules.

5        DATED this 7th day of December, 2015.

6

7                      ANDREW P. GORDON

8                      UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28